CHRYSLER CORP. *v.* SMITH.

1. UNEMPLOYMENT COMPENSATION—ADMINISTRATIVE OFFICERS—PUBLIC TRUST NATURE OF FUND.

The various officers provided for by the unemployment compensation act should remain neutral in all controversies concerning the eligibility or disqualification of claimants for compensation, as the unemployment compensation fund should never be used to finance claimants directly involved in a labor dispute nor denied claimants legally entitled to receive benefits to enable an employer to break a strike, the fund being one in the nature of a public trust fund (Act No. 1, Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

2. SAME—CONSTRUCTION OF TERM "ESTABLISHMENT."

An "establishment," as that term is used in provisions of the unemployment compensation act relating to disqualification of claimants for benefits, comprises all units synchronized and

employed by the employer in the accomplishment of a common
end (Act No. 1, § 29, subd. [d], Pub. Acts 1936 [Ex. Sess.],
as amended by Act No. 347, Pub. Acts 1937, and Act No. 324,
Pub. Acts 1939).

3. SAME—LOCK-OUT—EVIDENCE.

In proceeding by employer to review payment of unemployment
compensation to employees during the period of a labor dis-
pute, record *held*, to support finding of referee that employer
had not resorted to a lock-out (Act No. 1, § 29, subd. [d],
§ 38, Pub. Acts 1936 [Ex. Sess.], as amended by Act No.
347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

4. SAME—ELIGIBILITY OF CLAIMANTS—LABOR DISPUTE.

After some of the employees in the main and some other plants
of the employer failed to meet manufacturing production
standards set by the employer so greatly as to necessitate
stopping production in all plants so synchronized as to con-
stitute but one establishment notwithstanding some were as far
as 11 miles away from the main plant and this eventually re-
sulted in the calling of a strike by the union authorized to
bargain collectively, claimants working in all plants so
synchronized are disqualified from benefits under the unemploy-
ment compensation act by reason of the fact that their claims
are based on unemployment during period of a labor dispute
in which they are directly involved and which was in active
progress (Act No. 1, § 29, subd. [d], Pub. Acts 1936 [Ex.
Sess.], as amended by Act No. 347, Pub. Acts 1937, and Act
No. 324, Pub. Acts 1939).

5. CONTRACTS—THIRD PARTY BENEFICIARY.

A third party beneficiary may not accept the benefits of a con-
tract made in his behalf and reject the burdens.

6. UNEMPLOYMENT COMPENSATION—LABOR DISPUTE—DIRECT INTER-
EST OF CLAIMANT—ELIGIBILITY FOR BENEFITS.

A labor dispute that affects the wages, hours of work, and
general conditions of employment causes all employees con-
cerned to be directly interested within the meaning of pro-
visions of the unemployment compensation act relating to dis-
qualification of claimants for benefits (Act No. 1, § 29, subd.
[d], Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 347,
Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

7. STATUTES—CONSTRUCTION—EXECUTIVE INTERPRETATION—AMEND-
MENT.

The executive interpretation given a law by officials charged with
its administration must be presumed to have been known to

the legislature so that such construction would be carried with it and sanctioned when the legislature amends the statute and reenacts the language so construed.

8. Unemployment Compensation—Labor Dispute—Disqualification from Benefits.

A labor dispute, involving new contract provisions in which claimants, employed in all of the employer's nine coordinated plants, were directly interested, and the stoppage of work and calling of a strike in the main plant, measures well calculated to bring about a new contract of employment of direct interest to all claimants, disqualified employees in all plants from benefits under the unemployment compensation act (Act No. 1, § 29, subd. [d], Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

9. Same—Payment of Benefits Pending Appeal in Court.

Provision of unemployment compensation act stating that benefits thereunder allowed by the referee should be paid regardless of any appeal from decision of administrative appeal board established under the act *held*, inapplicable pending review of such board's determination as to disqualification of claimants for benefits because of direct interest in labor dispute, where construction that it would be applicable would render administrative action superior to recognized judicial power and constitute a denial of due process (Act No. 1, § 34, Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

10. Same—Employers—Parties—Review of Eligibility of Claimants.

The employer who contributes to the unemployment compensation fund has an interest in its proper distribution and a duty to see that the purpose and full integrity of the fund is preserved, hence is a proper party to proceeding to review right of claimants to awards (Act No. 1, § 34, Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

11. Same—Activities of Sole Bargaining Agent—Interdependent Plants of Same Employer.

Activities of union which was elected as the sole bargaining agent for employees in every plant of the employer and which resulted eventually in calling a strike at the main plant, which in turn resulted in cessation of work in all plants on account of their dependency upon main plant for materials upon which to work, constituted a labor dispute directly in-

volving claimants employed in all plants (Act No. 1, § 29, subd. [d], Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

12. COSTS—NOVEL QUESTION—PUBLIC QUESTION.
    No costs are awarded in proceedings arising out of the administration of the unemployment compensation act where the question involved is a new one in this jurisdiction and of public moment (Act No. 1, Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939).

BUSHNELL and MCALLISTER, JJ., dissenting.

Appeal from Ingham; Carr (Leland W.), J. Submitted October 16, 1940. (Docket No. 59, Calendar No. 41,309.) Decided May 21, 1941. Rehearing denied June 30, 1941.

Certiorari by Chrysler Corporation to review awards of unemployment compensation by Appeal Board of Michigan Unemployment Compensation Commission to August A. Smith and others. From judgment affirming such awards in part, plaintiff appeals and certain defendants cross-appeal. Reversed in part.

*Bulkley, Ledyard, Dickinson & Wright, Thomas F. Chawke,* and *John G. Garlinghouse,* for plaintiff.

*Maurice Sugar* and *Ernest Goodman,* for defendants August A. Smith and others, appellees, cross-appellants.

*Edward N. Barnard,* for defendants Fred Rhode and others, appellees, and Maurice R. Jenks and others, appellants.

*Florence N. Clement,* for defendant Michigan Unemployment Compensation Commission, appellee.

WIEST, J. The Chrysler Corporation manufactures automobiles and to that end maintains and

operates, in the Detroit area, nine essential, co-ordinated plants, known as the Dodge main plant, Dodge truck plant, Dodge forge plant, DeSoto, Dodge Amplex, Highland Park, Chrysler-Jefferson, Chrysler-Kercheval, and Plymouth. A labor dispute, actively in progress in the main plant, stopped work and occasioned unemployment of employees of the Chrysler Corporation in all of the plants. About 50,000 of the employees so affected made claims for unemployment compensation under Act No. 1, Pub. Acts 1936 (Ex. Sess.), as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939, known as the Michigan unemployment compensation act.*

Briefly stated, that act provides for a segregated fund created, in large part, by assessment upon employers of workmen and to be administered by a State commission with mapped procedure.

Section 29, subd. (d), of the act provides the following disqualification for benefits:

"For any week with respect to which his total or partial unemployment is due to a labor dispute which is actively in progress in the establishment in which he is or was last employed: Provided, however, That no individual shall be disqualified under this section if he shall establish that he is not directly involved in such dispute. For the purpose of this section, no individuals shall be deemed to be directly involved in a labor dispute, unless it is established: * * *

"(2) That he is participating in or financing or directly interested in the labor dispute which caused the stoppage of work."

The commission denied the claims for unemployment benefits. The claimants thereupon, as pro-

---

* Comp. Laws Supp. 1940, § 8485–41 et seq., Stat. Ann. 1940 Cum. Supp. § 17.501 et seq.—REPORTER.

vided in the act, had the matter sent to a referee appointed by the commission to take testimony and make report.

A consolidated hearing on typical test claims was conducted before the referee and testimony, occupying over 2,000 pages of the printed record, was taken. The referee found:

"The one stubborn and undisputed aspect of this case, however, is that, during the calendar week ending October 14, 1939, and thereafter, a labor dispute was actively in progress at the Dodge main plant; that this labor dispute caused a stoppage of work 'in 22 of the 28 production departments;' that the subject matter of the labor dispute was with respect to the wages, hours and general conditions of employment of all the hourly workers of that plant; that the condition of employment of all these hourly workers, whether in productive or nonproductive departments, are closely related; * * * and that, as a result of it, they were all as a matter of fact and law 'directly interested' in said strike within the meaning of section 29, subd. (d) (2), of the act and are, therefore, disqualified for the period of its duration.

"The same reasons led the workers of the Dodge truck plant to bring to a standstill production there, when they established a picket line around the plant November 1, 1939, and continued it to the termination of the strike on November 30, 1939.

"Hence, the appellants (and all other hourly workers—excepting a group of maintenance workers to be designated below) are disqualified for the calendar week ending November 4, 1939, and up to and including November 29, 1939.

"And the same is true of the appellants (and other hourly workers—excepting maintenance workers of the class to be designated below) of the Dodge forge plant who established a picket line November 8, 1939, are disqualified for the week ending

November 11, 1939, and up to and including November 29, 1939.

"The appellants and the workers of the other plants do not come within the labor dispute provisions of the act for the reasons already stated."

This last holding was based upon a conclusion of law that the term "establishment" covered only the units in which a labor dispute was actively in progress, regardless of the stoppage effect upon other units so synchronized thereunder as to be unable to function alone.

An appeal was taken to the appeal board. Upon review the appeal board found that the claimants worked at the various units within the Detroit area and that:

"All of these plants are within 11 miles distance of the Dodge main plant, which in many respects is the key plant of the entire organization. This particular plant supplies various parts or assemblies to all of the other plants and it is frequently referred to as the feeder or the principal supplier plant for the other manufacturing units of the corporation. Most of the corporation's manufacturing operations are functionally integrated and highly synchronized with the production of the Dodge main plant. During periods of normal production there are over 57,000 hourly-rated employees working in the corporation's plants in the Detroit area and of this number approximately 23,000 are employed in the Dodge main plant.

"The main offices of the corporation are, however, located at the Highland Park plant and it is from these offices that the general operations of the corporation are controlled. The central accounting, engineering, export, mailing, production, purchasing, routing and service departments of the corporation are all located in or immediately adjacent to the

general offices in Highland Park. Each plant has, however, individual plant managers and engineers who supervise the operations of their respective plants. * * *

"Shortly after production began on the 1940 models, labor difficulties were experienced between the corporation and many of its employees. * * * Perhaps at this point it is sufficient to state that the production standards set by the employer were not met by the workers and that the alleged slow-downs occurred mainly in the Dodge main plant. The corporation contended that the slow-downs increased until they affected approximately 50 per cent. of the scheduled production and that they gradually spread from a few departments until approximately 25 of the 28 departments of this plant were affected. In many instances operations were skipped by the employees and it soon became impossible to carry on a synchronized method of manufacturing. Labor difficulties were also experienced in a few of the other plants.

"Several conferences were held between representatives of the corporation and the union regarding these production problems but the situation gradually grew worse. Warnings were issued by the management that unless the employees discontinued their tactics disciplinary action would be taken. On October 6, 1939, the corporation discharged 57 employees for alleged participation in the slow-downs. Within the next few days 60 additional employees had been discharged and 7 had been laid off for periods of two weeks because of refusals to comply with instructions issued by the management. These 124 employees worked in 19 different departments in the Dodge main plant.

"Because of a shortage of parts and the production difficulties which were occurring among the various plants, operations gradually decreased in all of the corporation's plants in the Detroit area. On October 18, 1939, picket lines were established

at the Dodge main plant and at the transportation department located in the old Dodge truck plant. A picket line was established at the present Dodge truck plant on October 31, 1939, and still another picket line was established on November 6, 1939, at the Dodge forge plant. On November 25, 1939, an official strike was declared by the UAW-CIO at the Dodge main plant.''

The national labor relations board directed that elections should be held among all the production and maintenance employees of the company, excluding foremen, assistant foremen, time keepers, plant production employees, office employees, confidential salaried employees, and salaried engineers. These elections, by secret ballot, were conducted on or about September 27, 1939, and resulted in an overwhelming majority of the eligible employees from the various Chrysler Corporation plants in the Detroit area, voting in favor of the UAW-CIO. This union was subsequently certified by the national labor relations board as the exclusive representative of all such employees for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment.

The appeal board made the following applicable observation:

''We have always believed that it was the duty of the Michigan unemployment compensation commission, the referees, and the appeal board to remain absolutely neutral in all controversies concerning the eligibility or the disqualification of claimants. All interested parties who are involved in a claim for unemployment compensation, or in an appeal from any determination issued on such a claim, must be dealt with on an impartial basis. The un-

employment compensation fund should never be used to finance claimants who are directly involved in a labor dispute, nor should it ever be denied to claimants who are legally entitled to receive benefits. This fund is in many respects a public trust fund and all who have custody [of] or control over it are in reality trustees who must at all times administer the fund in strict compliance with the provisions of the law. None of the money accumulated in this fund should ever be disbursed for the purpose of financing a labor dispute nor should it be illegally withheld for the purpose of enabling an employer to break a strike. The State of Michigan, in so far as this act is concerned, must remain neutral in all industrial controversies.''

The appeal board also found that a labor dispute was actively in progress in the Dodge main plant from October 6, 1939, to November 29, 1939. The appeal board affirmed the holding of the referee relative to the term ''establishment.''

The holding of the board was reviewed by certiorari in the circuit court for the county of Ingham, and that court held that ''plaintiff's different plants must be regarded as separate establishments insofar as the application of section 29, subd. (d) is concerned.''

The court also found:

''The referee and the appeal board have found that labor disputes were actively in progress in at least three plants but that such was not the case as to the others. In view of the conclusion reached as to the meaning of the word 'establishment' such finding must be treated as one of fact. So considered it cannot be regarded as against the great weight of the evidence. It is not sufficient that employees in plants other than those in which strikes occurred had an interest therein. Rather such employees are

entitled to unemployment compensation under the act of the legislature as it is worded unless the stoppage of work was due to a labor dispute *actively* in progress in the plant of their own employment."

Under provisions of the act the Chrysler Corporation reviews by appeal, and a cross-appeal was also taken by certain claimants.

The main question is whether, under the legislative employment of the term "establishment" in section 29, subd. (d), of the act, the units constituting the work production system set up by the corporation should be held separate "establishments" or, as a whole, an "establishment." An "establishment," under the simplest definition and commonsense understanding, is merely something established. The purpose and use of the creation, if to accomplish an end in which all units are participants in bringing it about, constitutes the units, so synchronized and employed by the Chrysler Corporation in accomplishment of a common end, an "establishment" within the meaning of the term as employed in the act.

December 3, 1940, the supreme court of Wisconsin, in the case of *Spielman* v. *Industrial Commission,* 236 Wis. 240 (295 N. W. 1), considered the meaning of the term "establishment" in the unemployment compensation act of that State. The provision in the Wisconsin act reads:

"An employee who has * * * lost his employment with an employer because of a strike or other bona fide labor dispute shall not be eligible for benefits from such * * * employer's account for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed." Wisconsin Stat. 1939, § 108.04 (5) (a).

The import of that provision is the same as in the Michigan act. The Nash-Kelvinator Corporation manufactures automobiles, having plants at Milwaukee and Kenosha. Car bodies are manufactured at the Milwaukee plant and parts, other than bodies, at the Kenosha plant. The production in each plant was highly synchronized and the work of the two plants coordinated. The plants are about 40 miles apart, and the bodies taken from one plant to the other by trucks operated by employees of the corporation. Spielman was employed in the Milwaukee plant. Employees of the Kenosha plant, on account of a labor dispute, went on strike and that resulted in shutting down both plants.

The court held "that although the two plants were 40 miles apart, they were just as much a single establishment for the manufacture of automobiles as they would have been had they been in two buildings adjacent to each other."

The court affirmed the holding of the commission in denying compensation on the ground that the Milwaukee and Kenosha plants constituted an "establishment" within the meaning of the statute, because "of their 'physical proximity, functional integrality, and general unity.'"

It is stated in the brief for claimants:

"There can be no real controversy on the record in this case as to the immediate and proximate cause of the stoppage of work at the Dodge main plant.

"Prior to October 6th there was no stoppage of work at the Dodge main plant. Whether there was or was not a slow-down in one or more departments, it is conceded that no stoppage of work resulted.

"However, it is agreed by all witnesses that the demoralization of production resulting in a stoppage of work occurred immediately after the men were discharged on October 6th."

The claim that there was a lock-out by the plaintiff is without support, and so found by the referee.

In behalf of claimants it is contended:

"The sole cause of the unemployment of the Chrysler workers was the discharge of men at the Dodge main plant and the refusal of the company to rehire them. * * *

"The union took the position at the very outset of the trouble at the Dodge main plant on October 6th that it desired to have the men employed at the plant while contract negotiations were pending."

This tied the labor dispute, actively in progress, with the contract then wanted by the union and all subsequent events stopping work. Such labor dispute, actively in progress, and the stoppage of work in the Dodge main plant, that being the key to operation of all units, resulted, whether so intended or not, in closing operations in all units and in throwing plaintiffs and thousands of others out of employment.

The company found a shortage of output and, believing it occasioned by concerted action of the workmen, discharged a number. The UAW-CIO, bargaining agent for employees, took the matter up and advised the discharged workmen to go back and attempt to work. They were prevented. Then a membership meeting of the Dodge local voted to give the international union authority to call a strike in the Dodge main plant. A picket line was formed and, November 25, 1939, the UAW-CIO called a strike. A new contract was also a bone of contention and finally, December 1, 1939, differences were adjusted and operations were resumed at the Dodge main plant and at the other plants as soon as essential parts, manufactured at the Dodge main plant, were available.

We hold that the Dodge main plant and the mentioned synchronized units constitute one "establishment" within the meaning of that term as employed in the act, and claimants are disqualified from unemployment compensation by reason of the fact that their claims are based upon unemployment during a period in which a labor dispute, in which they were directly involved, was in active progress, and caused stoppage of operations in the establishment where they were employed.

Claimants invoke section 29, subd. (d) (2), of the act, and contend:

"That whether the plants of the Chrysler Corporation are treated as a single establishment or as separate establishments, all of the claimants in this case, including those employed at the Dodge main plant, are entitled to receive their benefits, since none 'participated in' or 'financed' or was 'directly interested' in the labor dispute which caused the stoppage of work."

The circuit judge said on this point, with reference to three plants, and which we think applicable to the establishment, the following:

"It must be borne in mind that claimants were all represented by their exclusive bargaining agency, duly selected as such at the election held under the auspices of the national labor relations board. Whether we regard the employees as acting through their agent, or treat them as third party beneficiaries, as counsel in their brief suggest, the practical result is the same. The third party beneficiary may not accept the benefits of a contract made in his behalf and reject the burdens. There is no escape from the conclusion that all employees in the plants in which strikes were called were 'directly involved' and were also 'directly interested.' The rule is too well settled to be questioned that a

labor dispute that affects the wages, hours of work, and general conditions of employment, causes all employees concerned to be directly interested. This is not a contingent, remote, or speculative interest, but rather must be regarded as directly within the meaning of the statute.

"It further appears that prior to the amendment made at the session of 1939, the appeal board had given to the expressions under consideration the meaning adopted by the referee. It is contended, in consequence, that the amendment at the last session was made in the light of such executive interpretation, which must be presumed to have been known to the legislature, and that the reenactment of the language so construed carries with it the sanction of legislative approval of such conclusion. That this is the general rule seems to be well settled. *Commerce-Guardian Trust & Savings Bank* v. *State*, 228 Mich. 316; *People* v. *Railway Co.*, 228 Mich. 596; *Brewster* v. *Gage*, 280 U. S. 327 (50 Sup. Ct. 115, 74 L. Ed. 457)."

The labor dispute involved new contract provisions in which claimants were directly interested, and the stoppage of work and the calling of a strike in the main plant were well calculated to bring about a new contract of employment of direct interest to all claimants. There is no merit in the point.

Pending judicial determination of the rights of claimants, the circuit court stayed payments out of the fund and denied claimants' motion to vacate the order.

Claimants invoked that part of section 34 of the act, reading:

"Provided, That if the final decision of a referee affirms the initial or an amended determination, or the appeal board affirms the final decision of a referee, allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be

taken, but if such decision is finally reversed, no employer's experience record shall be charged with benefits so paid."

This, if held applicable in the instance at bar, would render administrative action superior to recognized judicial power in the premises and constitute the provisions relative to appeal and court procedure a nullity. If construed, as applicable in this instance, it would render due process of law, expressly recognized and provided for in the act, nugatory and a senseless gesture. The circuit judge held the provision inapplicable, and we join in such holding without spending time in an endeavor to note its place, if any, under other circumstances.

Claimants question the right of the Chrysler Corporation to appear and contest their right to awards. This requires but short answer. As a contributor to the fund, having an interest in its proper disbursement, it was the right of the corporation, if not its duty, to see that the purpose and full integrity of the fund was preserved.

In *Pittsburgh Plate Glass Co.* v. *National Labor Relations Board,* 313 U. S. 146 (61 Sup. Ct. 908, 85 L. Ed. 1251), decided April 28, 1941, it was held that, under election, the CIO, having a majority of all employees in five of the six plants of the flat glass division, located in five different States, was the sole bargaining agent for employees in all six on the ground that the entire division is a single bargaining unit, thus negativing the claim that the Crystal City union, which claimed a majority at that plant in Missouri, should be separated from the rest of the division for the purpose of fixing the bargaining unit.

In the case at bar, under the election ordered by the national labor relations board, the UAW-CIO

became the sole bargaining agent for every plant division of the Chrysler Corporation and, as such, its activities in the labor dispute directly involved claimants and their interests.

Judgment will be entered in this court in accordance with this opinion but, the question being new in this jurisdiction and of public moment, neither party will recover costs.

SHARPE, C. J., and CHANDLER, NORTH, and BUTZEL, JJ., concurred with WIEST, J.

McALLISTER, J. (*dissenting*). It is unnecessary to recite the essential facts in this case which have been stated in the accompanying opinion of Mr. Justice WIEST.

There are three main questions presented on this appeal:

1. Whether there was a labor dispute actively in progress in the establishment in which claimants were employed.

2. Whether claimants were directly interested in the labor dispute which caused the stoppage of work.

3. Whether, under the circumstances of this case, the word "establishment," as used in the statute*, means a separate plant or factory, or embraces the entire group of plants or factories owned by the Chrysler Corporation, engaged in the manufacture of automobiles in Detroit and its vicinity.

With regard to the question as to whether there was a labor dispute actively in progress in the establishment in which defendants were employed, the unemployment compensation commission found that

---

* Act No. 1, Pub. Acts 1936 (Ex. Sess.), as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 8485–41 et seq., Stat. Ann. 1940 Cum. Supp. § 17.501 et seq.).—REPORTER.

all workers in all plants of the Chrysler Corporation in the Detroit area were working in one establishment; that they were all involved in a labor dispute actively in progress in such establishment; and the commission disqualified all such employees from unemployment compensation. The referee found that there was such a labor dispute, involving wages, hours and conditions of employment, in the Dodge main plant, the Dodge truck plant, and the Dodge forge plant, and disqualified only the employees in such plants. He further held that there was no labor dispute actively in progress in any of the other plants of the Chrysler Corporation.

The appeal board, on the question of a "labor dispute actively in progress," adopted the findings of the referee and, in addition, found that there was such a dispute in progress in the transportation department and disqualified such employees from compensation. The circuit court, on this proposition, affirmed the appeal board.

Section 38 of the Michigan unemployment compensation act provides that the "findings of fact made by the appeal board acting within its powers, if supported by the great weight of the evidence, shall in the absence of fraud be conclusive." We have carefully examined the extensive record on this point and are of the opinion that the findings of the appeal board thereon are supported by the great weight of the evidence, and that the circuit court was correct in its finding.

The next two questions had best be discussed together, as they both involve an interpretation of the word "establishment," and are questions of law.

Were claimants "directly interested" in a labor dispute which caused the stoppage of work in the establishment in which they were employed? The referee held, in effect, that in the plants where no

labor dispute existed, none of the employees of such plants were directly interested in any labor disputes in the other plants; but that in the plants where such disputes were actively in progress all the hourly-rated employees of such plants were directly interested in the dispute. The appeal board held that no employees in plants where a labor dispute was not in progress were directly interested in the labor disputes in the other plants; but that employees in plants where a labor dispute was in progress had the right of proving as a matter of fact whether they were interested in the dispute. The circuit court declined to follow the determination of the appeal board on this question, but affirmed the decision of the referee thereupon. The question, therefore, resolves itself into a determination of whether, as a matter of law, an employee in a plant in which a labor dispute is actively in progress is *ipso facto* directly interested in such dispute.

Section 29 of the Michigan unemployment compensation act provides that an employee shall be disqualified for benefits if it be established that "he is participating in or financing or directly interested in the labor dispute which caused the stoppage of work." It is conceded that claimants did not participate in or finance the labor dispute in question. Were any of them "directly interested" therein? It is contended by the employees who were found to be employed in plants where a labor dispute was actively in progress, that they cannot be held to be directly interested in the dispute when they establish by proof that they had nothing to do with the dispute; that it was carried on without their approval or support; that they were willing to work, and were, merely, in their loss of employment, the victims of a dispute which owed its origin, impetus, and maintenance to the desires and efforts of others.

It might well be considered that the term "directly interested" could be interpreted as meaning an intellectual or emotional interest in the dispute—such as sympathy, approval, moral support, or encouragement of the cause of those carrying on the controversy—rather than an interest which was interpreted to mean a possibility of sharing in advantages or benefits with relation to wages, hours, or conditions of labor, that might be eventually derived as a result of the dispute. In the first instance, such claimants could well contend that they were not directly interested in the dispute; in the latter instance, they would be directly interested, even though contrary to their desires.

If no construction had heretofore been attached to the language used in the statute, the claims of the employees in question would be cogent and persuasive. But the force of their argument is diminished by certain considerations.

Our law of unemployment compensation was modeled after the English statute which was adopted by Parliament 21 years ago (10–11 Geo. V, chap. 30 [1920]). One of the sections* of that enactment, as later amended (14–15 Geo. V, chap. 30, § 4 [1924]), provides that an employee shall be disqualified from benefits if he has lost employment by reason of a stoppage of work which was due to a trade dispute at the factory, workshop, or other premises in which he was employed, unless such employee proves that he was not "participating in or financing or *directly interested*" in the trade dispute which caused the stoppage of work. It will be seen that, in this particular of disqualification, our legislature adopted, in our statute, the identical language of the English statute. There have been

---

* Section 8.—REPORTER.

numerous interpretations of the words "directly interested," as used in the English statute, by the court of referees and the British umpire, the highest administrative tribunal provided for in the English act. All of the decisions of the court of referees and the British umpire on this question have invariably held that an individual is directly interested in a dispute when his wages, hours, or conditions of work will be affected favorably or adversely by the outcome; and a claimant is nonetheless directly interested even though he does not know until after the settlement of the dispute whether his wages will be affected, provided, however, that the wage question did not arise after the settlement of the dispute.*

The fundamental rule of construction of a statute is that the court shall, by all aids available, ascertain and give effect to the intention of the legislature. Where the language of a statute is uncertain, the construction placed upon it by contemporaries may be resorted to as an aid to ascertain the legislative intent, and should not be overturned, except for cogent reasons. 59 C. J. p. 1022. This especially is true where the statute is an ancient one and the construction is that of contemporaries who had special knowledge of the subject. See *Frey* v. *Michie*, 68 Mich. 323; *Attorney General* v. *Preston*, 56 Mich. 177; *People* v. *May*, 3 Mich. 598. Where a statute is adopted from another State or country, it will be presumed it has been adopted with the construction placed upon it by the courts of that State or country before its adoption, and it has been held by this court that English cases may be recognized

*See cases in Unemployment Insurance Code (British): No. 177/1926 (22/1/1926) U. I. C. 8, p. 727; No. 692/1925 (23/4/1925) U. I. C. 8, p. 614; No. 24289/1932 (16/12/32), U. I. C. 8c, p. 494; No. 7936/1929 (4/11/1929), U. I. C. 8a, p. 356; No. 2735/1934 (2/3/1934), U. I. C. 8c, p. 578.

in construing a statute adopted from the English law. *Grand Rapids Lumber Co.* v. *Blair,* 190 Mich. 518. While it is true, in this case, that the English statute, so far as is here pertinent, has not been construed by courts of last resort in England, nevertheless the construction of the act by the highest administrative body entrusted with the determination of questions of law and fact thereunder persuades this court to adopt the same rule in construing a statute adopted from the English law, as though the statute had been there construed by the courts. The powers of administrative tribunals have greatly increased in England and in our Federal and State government within the past 30 years. In many instances, under this development of administrative law, statutes remain for a long period of years without any construction of their essential provisions by the courts. Such construction is only to be found, in such cases, in the decisions of administrative tribunals which have been acceded to by the parties involved, under the assumption that such interpretation is correct and would not be disturbed by the courts. Where a construction of a statute has for many years been given a certain effect by an administrative tribunal without contrary decisions from the courts, it is most persuasive that, when the language of such a statute is enacted in another jurisdiction, the legislature must be considered to be acquainted with such construction thereon placed, and to enact such statute with the intention that the construction theretofore given it should be considered as the proper construction. In the instant case, therefore, we are of the opinion that it was the intention of our legislature, in adopting that provision of the English law now in controversy, to have enacted it with the implied indorsement of such construction, as had always been given it by the

highest administrative tribunal concerned therewith.

It is contended on the part of claimants that the English statute provides two grounds for disqualification; namely, that benefits are denied unless the employee proves that he did not participate in, finance, or was directly interested in the dispute which caused the stoppage of work; "*and* that he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage is taking place, any of whom are participating in or financing or are directly interested in the dispute." It is claimed that our legislature, in adopting the rule of disqualification of an individual based upon "directly interested," rejected the "grade or class" rule, and that, therefore, it was intended that an employee in this State is not to be disqualified solely because he is affected by the result of a labor dispute. However, an examination of the decisions of the British umpire heretofore mentioned reveals that the ruling on "direct interest" of an employee was established without relation to the grade or class provision of the statute.

In accordance with the foregoing, we concur with the circuit court in holding that an employee directly interested in a labor dispute is one whose wages, hours, or conditions of work will be affected by the outcome of the dispute; and that in view of the fact that the findings of the appeal board show a labor dispute to have been actively in progress, involving wages, hours, and conditions of work, in the Dodge main plant, the Dodge truck plant, the Dodge forge plant, and the transportation department, all claimants who were employees in such plants were directly interested in the labor dispute which was actively in progress in such plants.

Perhaps the most important question in this case is the construction to be given to the word "establishment" as used in the statute. It is the contention of the appellant that the Chrysler establishment embraces all the manufacturing plants of the Chrysler Corporation in the Detroit area; that the labor dispute in one plant, which brought about stoppage of work in the other plants, was a labor dispute in the establishment in which all the claimants were employed; and that inasmuch as the unemployment was due to a labor dispute which was actively in progress in the establishment in which claimants were employed, they are, under the provisions of the statute, excluded from its benefits. On the other hand, it is contended by claimants that each manufacturing plant is a separate establishment.

In arriving at a meaning of the term "establishment," dictionary definitions are of practically no assistance because of the many, various, and general meanings set forth. Likewise judicial interpretations with regard to this term in other statutes and cases are so limited in scope as to be of no value in this controversy. In order to discover the meaning of the term as intended by the legislature, recourse must be had to the object and purpose of the law.

The title of the act commences: "An act to protect the welfare of the people of this State through the establishment of an unemployment compensation fund." Another object of the act, expressed in its title, is: "to provide for the protection of the people of this State from the hazards of unemployment."

Section 2 of the act sets forth the declaration of policy of the legislature as follows:

"The legislature acting in the exercise of the police power of the State declares that the public policy of the State is as follows: Economic insecurity due to unemployment is a serious menace to

the health, morals, and welfare of the people of this State. Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this State. Social security requires protection against this hazard of our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this State.''

In stating that it acted under the police power of the State in its declaration of policy, the legislature sought to exercise its powers on behalf of all of the people of the State. The legislation was not concerned with individuals; it was an effort to *insure* against unemployment; to protect the people of the State from unemployment; to protect purchasing power; to build reserves for the benefit of those unemployed through no fault of their own; to act for the public good and general welfare of all of the people of the State. The legislature was concerned with the economic security of the people as a whole. It was not especially concerned with benefits to an individual, except the ''benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance.'' All of the workers claiming benefits in this case are eligible under the requirements of the act. The claims made

are in the nature of representative claims involving many thousands of employees who suffered unemployment through no fault of their own. If they are not to receive the unemployment benefits, it can only be because they are specifically disqualified under the act. Certain of the claimants are so disqualified, because they were "directly interested" in the labor dispute, and the statute provides that such interest is a disqualification. But the other claimants can only be disqualified on a holding that all of the various plants constitute one establishment, thus making the employees of all plants directly interested in a labor dispute in progress in the establishment in which they were employed.

There are here thousands of employees who would be entitled to a fund of several millions of dollars for unemployment compensation unless it should be held that all the separate factories of Chrysler Corporation constituted one establishment within the meaning of the statute. The legislature did not say that numerous factories constitute one establishment for the purpose of the act. It did, however, define such terms as "benefits," "remuneration," "wages," "calendar quarter," "week," "base period," "benefit year," "employer," "employing unit," "employment," "partial unemployment," "total unemployment," and "employment office." It could have defined "establishment." But since it did not, we are not persuaded that this term should be defined and construed by us in a way that would obliterate the expressed object of the statute, and wipe out the declaration of policy as stated by the legislature.

The adverse conditions envisaged in the act, and which were sought to be guarded against, were present. There was vast unemployment. It was involuntary on the part of the appellee-claimants; they

were unemployed through no fault of their own; purchasing power was adversely and seriously affected in the community; serious social consequences of relief assistance obviously were imminent. These were the situations the statute was enacted to avoid. We are bound to conclude that the legislature never intended that the meaning of the word "establishment" should be interpreted in such a way as to leave this beneficial statute moribund in the emergency and peril it sought to overcome.

Since the argument of this case, the supreme court of Wisconsin has had occasion to pass upon the meaning of the term "establishment" as used in the unemployment compensation act of that State, and appellant Chrysler Corporation cites the decision thereupon as authority for its contention before us. *Spielmann* v. *Industrial Commission,* 236 Wis. 240 (295 N. W. 1). The cited case involved claims for unemployment compensation arising out of a stoppage of work in the plants of the Nash-Kelvinator Corporation. A strike caused the closing of one plant which resulted in stoppage of work and plaintiff's unemployment in another plant 40 miles away. The question to be decided was whether the labor dispute in the first plant was a labor dispute in active progress in the establishment in which plaintiff was employed. The court concluded that the two plants constituted a single establishment within the meaning of the Wisconsin statute.

In considering the Wisconsin case, we deem it significant that the court, in construing the term "establishment," particularly emphasized that, in arriving at its determination of the meaning of that word, the purpose of the statute must be considered, and that the statute must be construed to effect that purpose, if discoverable, and if such a construction were possible. The court then pointed out that it

was the employer upon whom the burden was placed to accumulate the fund out of which benefits were to be paid, and that it was the company who was required to accumulate the fund; that the employer was encouraged by the act to furnish steady employment. It was further emphasized that these declarations of purpose pointed to the construction reached by the court that the two plants constituted a single establishment. Moreover, the court observed that the fact that the employee was not himself at fault for his loss of employment, was not the sole cause, under the statute, for suspension of benefits; that the law provided that such an employee was not eligible in case the loss of employment was caused by act of God, fire, or other catastrophe, or act of civil or military authority affecting the place of employment. The court concluded its discussion of this question by stating that the meaning of the word "establishment" was to be drawn from the whole act, "rather than from so insignificant a thing as a single proposition."

The differences between the Wisconsin and Michigan statutes are obvious. In the Wisconsin statute there is no declaration of policy, as in our law, that the accumulation of funds for unemployment reserves should be used for the benefit of persons unemployed through no fault of their own, in order to limit the consequences of relief assistance. In this connection, the court, in the cited case, observed that in many instances compensation for loss of employment was denied under the Wisconsin law, although the unemployment resulted "from no fault of the employee and the loss is beyond his power to prevent." Furthermore, the Wisconsin law sets forth in its declaration of policy that each employer should finance compensation for his own unemployed workers and that each employer's contribu-

tion should vary with his own unemployment costs. The reserves, under the Wisconsin law, are in the nature of private funds of each employer to be used for his unemployed workers. The State acts as a trustee. The Michigan fund is a general pooling, made up of various contributions, for the benefit of all unemployed workers, whether in the plant of the employer making the contribution or in another plant. Our State declares its public policy is to provide against *involuntary unemployment*. There is no similar provision in the Wisconsin law; and that is not the criterion for the payment of benefits under the statute of that State. With regard to declarations of policy, the Wisconsin decision does not militate against the expressed policy of the law of that jurisdiction. To give the construction to the Michigan statute which is contended for by appellant is a negation of the declared policy of our legislature. Under these circumstances, and because of the differences in the objects and declarations of policy in the two statutes, we do not consider the Wisconsin case as authority to be followed in the instant controversy.

There are indicia, also, that our legislature did not intend that an establishment should mean the entire group of plants. In section 29, subd. (d) (3), of the act, in provisions for disqualification from benefits, it is set forth: "That at any time, there being no labor dispute in the establishment or department in which he was employed he shall have voluntarily stopped working." If "establishment" is to be construed as appellants argue, it would seem difficult to explain how such an inclusive term should be followed by the words "or department." Under the construction contended for, there would be no need of such an additional term. "Establishment," in such case, would embrace "department." It

would appear more reasonable to conclude that the legislative intent was to apply the word "establishment" to a plant or factory.

The Michigan statute further distinguishes between an employing unit and an establishment; and, as the circuit court stated: "It seems a fair conclusion that the word (establishment) is not used synonymously with 'employing unit,' found elsewhere in the statute. Obviously it is limited in its scope."

Furthermore, in section 40 of the act it is set forth:

"All individuals performing services within this State for any employing unit which maintains two or more separate establishments within this State shall be deemed to be employed by a single employing unit for all the purposes of this act."

Obviously, this provision contemplates a single employer with several establishments. We are not persuaded, as appellant contends, that the foregoing language is intended to cover a case where one employer is engaged in several different kinds of business. The statute itself does not so provide. It only indicates that one employer may have several establishments; and there is nothing further to show whether the several establishments may be concerned with the same kind of business or different kinds of business. It may be remarked that usually, when an employer has two plants, they are engaged in the same kind of industry or in integrated industry. It is persuasive that, without further definition, the use of the plural of the word "establishment," provision for a situation where one employer has more than one establishment, the distinction made between an establishment and a department—as well as the purpose of the act, disclosed by its

title, and the clear statement of policy set forth in section 2 of the statute—all of these statutory considerations could be said to encompass an employer who has several establishments engaged in the same kind of industry, in integrated industry, or in different kinds of industry.

The fundamental basis of the contention of the Chrysler Corporation is that, in integrated industry, all of the various plants of a company must be considered to constitute one establishment. There is no provision, however, in the statute that indicates such was the intention of the legislature. Industry is integrated as often where the integrated plants are owned by different corporations as where they are owned by the same corporation.

Different integrated plants owned by the same corporation may have as employee representatives different bargaining agents, and it is not claimed that the action of a bargaining agent for certain employees can bind other employees employed in a different plant and represented by a different bargaining agent. And integrated plants owned by the same corporation are often located in different States; and the employees of such plants may, furthermore, be represented by different bargaining agents. No contention is made that integrated plants of different owners in the same State, or integrated plants owned by the same corporation operating under the laws of different States, or integrated plants in the same State or different States in which employees are represented by different bargaining agents, should be considered one establishment within the meaning of the act. The conclusion, therefore, would seem inevitable that the provisions of the act in no way contemplate that integration of plants is the sole criterion for the statutory interpretation of the word "establish-

ment"—and that several integrated plants are one establishment while several unintegrated plants are several establishments.

It is our conclusion from the foregoing that the several plants of appellant Chrysler Corporation must be held to be separate establishments within the meaning of our statute, and in this determination we concur with the conclusion of the referee, the appeal board, and Judge Carr, who affirmed their decisions.

It is claimed that the act is directed against strikes in industry. This does not appear from the title or the express policy of the act. As succinctly stated by counsel for the Michigan unemployment compensation commission in her brief:

"It is important to note that the purpose of this act is not the regulation of labor disputes. Other statutes deal with the various rights and obligations arising out of the employer-employee relationship."

But it is sought to intimate that the penalty of exclusion from benefits attaches because of blame for participating in a strike, or in membership in a union conducting a dispute. This is not the fact.

In the history of the legislation, it is of interest to note that under the original English statute 10–11 Geo. V, chap. 30, § 8-[1] [1920]), employees were disqualified from benefits if the stoppage of work resulted from a labor dispute, whether or not such employees participated therein, and regardless of the fact of whether they would be interested in the result of the dispute. It is merely a broad exception —of the same nature as an exception in an insurance policy, limiting liability to claims filed within 25 days, instead of within 30 days. This provision was, however, changed in 1924 (14–15 Geo. V, chap. 30, § 4-[1]), permitting compensation unless the em-

ployee participated in, financed, or was directly interested in the dispute. This change, then, excluded employees who were helping in the dispute causing the stoppage of work, doubtlessly on the theory that they were to blame for their unemployment, whether or not the dispute was justified—and continued the exclusion of employees who had no part in the dispute, but whose wages might be affected by the result of its determination. This latter was as arbitrary an exclusion as the original provision; and this same provision was adopted in our statute. It is difficult to find any reason upon which it is based other than the conservation of the reserve fund by limiting claims to be paid therefrom. Thus all workers, unemployed through no fault of their own, would be entitled to share in benefits if it were not for these express and arbitrary exceptions in the statute. But such exceptions must be strictly limited, and the statute liberally construed, to effect its stated purpose. Unless the employees are directly interested in the dispute in progress *in the plants in which they are employed,* they are not disqualified unless they come within other express exceptions; and, in this case, they do not.

The disqualifying provisions are explicit exceptions. Unemployed workers are denied the right to benefits if they fail to accept suitable work when offered; but no work is deemed suitable if the position offered is due to a vacancy resulting from a strike, lockout, or labor dispute (section 29, subd. [c]). Employees are also disqualified from benefits if they voluntarily stop work in concert with one or more employees (section 29, subd. [d] [1]); or if an employee stops work in sympathy with employees in another establishment or department in which a labor dispute is in progress (section 29, subd. [d] [3]); and, as before stated, they are further dis-

qualified if they participated in, financed, or were directly interested in the labor dispute which caused the stoppage of work (section 29, subd. [d] [2]), *provided that the labor dispute causing the stoppage of work is actively in progress in the establishment in which they are employed* (section 29, subd. [d]); and it is expressly provided that the payment of regular union dues shall not be construed as financing such a dispute (section 29, subd. [d] [2]). In other words, the payment by an employee of regular union dues to an organization carrying on a labor dispute is not to be considered as financing the labor dispute so as to exclude the employee from benefits under the act. The employee must do something further to financing the dispute, to be excluded —or he must participate in, or be directly interested in, the dispute in active progress in the establishment in which he is employed, under the subsection. In this case, claimants in the establishments in which the dispute was in progress were, in spite of the wishes of various of them, directly interested in the dispute—which was found, as a matter of fact, to be concerned with wages, hours, and conditions of work of all hourly-rated employees, to which classification such claimants belonged.

But in the other establishments of Chrysler Corporation employees could not be said to be "interested" in the dispute causing the stoppage of work, as such exclusion only applied to an interest of employees in establishments *where the dispute is in active progress;* and all of the findings of fact are to the effect that the dispute was in active progress only in plants heretofore mentioned.

It is suggested that such conclusion would enable employees in plants where the labor dispute was not in progress to cause stoppage of work in their own plants with impunity by financing or participating

in a strike or dispute in another integrated plant—
that the effect would be to stop production in an-
other plant which would cause a stoppage of work
in the plant in which they were employed, even
though no labor dispute was there in progress.

On the contrary, however, we are of the opinion
that such employees would be barred from benefits
under the act, but not under provisions excluding
them because of financing or participating in a dis-
pute in a plant in which they were employed. Such
employees in integrated industry would be excluded
from benefits under the provisions relating to their
voluntarily stopping work in concert with other em-
ployees or in sympathy with employees in another
establishment (section 29, subd. [d] [1]).

If one engages in conduct that he knows will have
a certain result, he is presumed to have acted with
the intention of bringing about such a result. If an
employee in integrated industry knows that the clos-
ing of another plant will result in the closing of the
plant in which he is employed, he must be held to
have intended to bring about the closing of his plant
if he assists in the closing of the other integrated
plant. And if he helps, by financing or participating
in closing such a plant, he becomes unemployed
through his own volition—which is the same as vol-
untarily stopping work—and would thereby be ex-
cluded from the benefits of the act under section 29,
subds. (d) (1) and (3).

But in the case before us, claimants did not par-
ticipate in, or finance, such a dispute, and can only
be disqualified because of being directly interested
in a labor dispute in active progress in the establish-
ment in which they were employed. As the court
found that there were no labor disputes actively in
progress in the plants in which claimants, who were
awarded compensation, were employed, they do not

come within the exceptions of the act and are entitled to compensation.

There is considerable discussion in appellant's brief of the disqualification of employees from benefits because of their union membership and because of the dispute being sponsored by such union; or because their bargaining agent was actively engaged in the dispute. Under our determination as above set forth, such argument is not pertinent in the circumstances as disclosed in this case. The disqualification occurs when the employee participates in, finances, or is directly interested in the labor dispute actively in progress in the establishment in which he is employed. If there is no such dispute in progress in the plant in which he is employed, he is not disqualified unless he voluntarily quits work. Membership in a union or representation by a collective bargaining agent which is carrying on a dispute in another establishment does not disqualify an employee from benefits, where his unemployment does not result from a labor dispute actively in progress in the establishment where he is employed, under the clear language of the statute.

While, in many important considerations, employees are bound by action of their bargaining agent, certainly a member of an international union cannot be said to be participating in a dispute in a factory other than that in which he is employed, merely because the international union, which is his bargaining agent, is carrying on a dispute on behalf of an entirely different local. The representation of the local by the international union extends to acts of agency in representing the local. Where one local union is represented in a dispute by the international union, an entirely different local is not bound by the action of the international in such a dispute. It may be true that, where the employees

in a plant, by majority vote, select a bargaining agent, all employees in such plant, whether members of the union or not, are entitled to the benefits secured in contracts by such agent and are, as well, subject to the action of the agent, even though disadvantageous and detrimental, whether or not they are members of the union or organization represented by such bargaining agent. But participation by the international union in a labor dispute on behalf of a local union is not participation of every local represented by the international in such a local dispute. This would be an unwarranted extension of the principles of agency.

The statute before us must be liberally construed to effectuate the purposes of the legislation.

"In construing a statute to give effect to the intent or purpose of the legislature, the object of the statute must be kept in mind, and such construction placed upon it as will, if possible, effect its purpose, and render it valid, even though it be somewhat indefinite. To this end it should be given a reasonable or *liberal construction;* and if susceptible of more than one construction, it must be given that which will best effect its purpose rather than one which would defeat it, even though such construction is not within the strict literal interpretation of the statute, and even though both are equally reasonable." 59 C. J. p. 961.

"In construing such [remedial] statutes, regard should be had to the former law, the defects or evils to be cured or abolished, or the mischief to be remedied, and the remedy provided; and they should be interpreted liberally to embrace all cases fairly within their scope, so as to accomplish the object of the legislature, and to effectuate the purpose of the statute by suppressing the mischiefs and advancing the remedy, provided it can be done by reasonable

construction in furtherance of the object." 59 C. J. p. 1107.

"The liberal rule of construction only requires that a statute be so enforced as to carry into effect the will of the legislature as expressed in the terms thereof, and to give, not stintedly or niggardly, but freely and generously, all the statute purports to give." 25 R. C. L. p. 1076.

The purpose of the legislation is to pay unemployment compensation benefits and to ameliorate the consequences of widespread unemployment. Such compensation is payable to unemployed workers with certain exceptions. To bring claimants within such exceptions, it is necessary to strain at the meaning of the language of the statute and to read into the act exceptions with regard to "integrated industry," which are not mentioned anywhere in the legislation. To say the least, this would result in a narrow rather than a liberal construction of the meaning of the statute. It is most salutary, and in this case, in our opinion, conclusive, to bear in mind that the purpose of the legislation is to pay unemployment benefits, and not to refuse them; and a liberal construction results in the allowance of the claims rather than their denial.

The circuit court denied compensation benefits to all hourly-rated employees whose unemployment was caused by stoppage of work due to a labor dispute actively in progress in the plants in which they were last employed. Compensation was allowed to all employees whose unemployment commenced prior to the labor dispute in the above-mentioned plants, and to certain maintenance employees whose rights thereto are not questioned. The court granted compensation to all other claimants who were last

employed in the six plants where no labor dispute was found to have been actively in progress.

For the reasons stated in the foregoing opinion, the judgment of the circuit court should be affirmed. As this is a case of first impression and of public moment, no costs are allowed.

Bushnell, J., concurred with McAllister, J.

Boyles, J. (*concurring in part*). I concur in the conclusion reached by Mr. Justice McAllister, adopted from the English rule, that "an employee directly interested in a labor dispute is one whose wages, hours, or conditions of work will be affected by the outcome of the dispute." Under this rule, the Chrysler employees in all of the various units of the company's plants were directly interested in the labor dispute under consideration. Whether members of any union or not, the wages, hours, or conditions of work of all alike would be affected favorably or otherwise by the outcome of the dispute. I concede that this construction may appear to work a hardship on some employees who may not be in sympathy with a labor dispute. However, our labor policy now seems to be well established that sole bargaining rights by the majority involves assent to the exercise thereof by individuals who constitute the minority.

During the reargument of this case ordered by this court, it was generally conceded that the several plants referred to in the circuit judge's opinion were "functionally integrated." We should not be concerned in technical niceties between the meaning of "functionally integrated" and "interrelated, highly synchronized, or interdependent." Beginning early in October a labor dispute was actively in progress, resulting in general unemployment in all these

plants. With the merits of the dispute we are not concerned—so far as the act* is concerned, it suffices that a labor dispute was actively in progress.

Fundamentally, the foregoing applies to the Chrysler employees in all of the plants of the company that were closed down when no longer fed with parts or material from the main plant or by the transportation system of the company. I am compelled to reach the conclusion that "establishment" includes all of the integrated plants of the company in this operating area. In that respect, I concur in the result reached by Mr. Justice WIEST.

The language of section 29 of the act is quite involved and this case primarily concerns a construction of this section of the statute. It is argued by claimants that under section 34 of the act they are entitled to payment regardless of pending court proceedings, when applications for benefits have been "twice affirmed," *i. e.,* (1) by the referee, and (2) by the appeal board. The effect of such a construction would render payments a moot question pending court decision. Section 34 cannot be construed to deprive this court of jurisdiction to review questions of law and (within proper limits) questions of fact, especially where a construction of the meaning of the act is involved. Section 38 expressly provides for review by the courts.

Judgment should be entered in accordance herewith, to include all of the several plants in the same classification, applying equally to claimants herein.

* Act No. 1, Pub. Acts 1936 (Ex. Sess.), as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 8485–41 *et seq.,* Stat. Ann. 1940 Cum. Supp. § 17.501 *et seq.*).—REPORTER.