46 N.J. Super. 299 (1957)
134 A.2d 723
GUY SORICELLI, APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 1957.
Decided September 20, 1957.
*302 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Guy Soricelli, appellant, argued the cause pro se.
Mr. Edward A. Kaplan argued the cause for respondent (Mr. Clarence F. McGovern, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal by claimant Soricelli, pro se, from a denial of unemployment compensation benefits under the New Jersey Unemployment Compensation Law, R.S. 43:21-1 et seq.

*303 I.
Soricelli initially filed an interstate claim for New Jersey unemployment benefits through the Pennsylvania Bureau of Employment Security. Our Division of Employment Security made a determination disqualifying claimant under N.J.S.A. 43:21-5(d) from receiving benefits for the period November 21, 1955 to February 28, 1956, for the reason that his unemployment during that time was due to a work stoppage caused by a labor dispute at the employer's premises. Claimant then appealed to the Appeal Tribunal of the Division, and at its request a hearing was held before a referee of the Pennsylvania Unemployment Compensation Board of Review. At that hearing it was stipulated that pertinent parts of testimony previously taken in Pennsylvania in a test case brought by claimant's co-worker, Hugh Oliver, be made part of the Soricelli record. The Pennsylvania referee then sent the transcript of testimony in both cases to the Appeal Tribunal for determination of Soricelli's claim. The Appeal Tribunal found that claimant's unemployment was due to a work stoppage which existed because of a labor dispute at his employer's premises. To avoid disqualification he would have to show he did not participate in that dispute; by contributing to the striking union, although in a small amount, he had helped finance the dispute. Accordingly, the Appeal Tribunal held that Soricelli was disqualified for benefits, under N.J.S.A. 43:21-5(d), and affirmed the deputy's determination.
Upon further appeal, the Board of Review affirmed this result. Claimant then appealed to this court, which entered an order on November 30, 1956 remanding the matter to the Board for rehearing and additional findings of fact. In requesting the rehearing claimant had said he had "reason to believe there were certain facts misrepresented" by the Pennsylvania referee who had conducted the original hearing. (That hearing, it should be noted, had been recorded electronically and the transcript of testimony prepared by the hearing stenographer direct from the recording.)
*304 At the rehearing, held January 2, 1957, claimant explained that by his charge of "misrepresentation" he meant the "unfair" questions that had been asked of him by the referee, and the improper inferences the referee had drawn from his answers. Claimant was invited to point out the specific portions of the testimony with respect to which he took exception or wished clarification. Soricelli expressed some dissatisfaction with the referee's having included as part of the record the testimony in the Oliver case, although he himself had expressly agreed to such inclusion at the original hearing. In any event, claimant gave no reason for this objection, nor did he show in just what way he had been prejudiced. He also took exception to questions put to him at the original hearing which, he claimed, tended to create the impression he had received strike benefits as a result of his contribution to the strike fund. We observe, in passing, that this was not the ground on which the Board based disqualification.
We need not further detail the several matters with which Soricelli found fault. His reasons for dissatisfaction with the original hearing shifted with the progress of the rehearing. His complaints were vague and elusive. A fair reading of his testimony at the rehearing leaves us with the indelible impression that all he was doing was fencing with the Board as to the meaning of words used and its reasons for questions asked. We find that both the hearing and rehearing were fairly conducted. Soricelli was given every consideration; the fullest opportunity was afforded him for a complete exposition of his version of the facts and to explain why he should not be disqualified for unemployment benefits.
As a result of the rehearing the Board of Review found that Soricelli had voluntarily refused to cross the picket line of a striking union at his employer's plant, and had admitted as much; that a letter he had received from his employer on the morning of the day he failed to return to work, clearly informed him that work was available for him; that of 1,400 workers at the employer's premises, 1,300 continued work after the strike was called, with only members *305 of the striking union, claimant's union and one other union failing to report; that work in the plant continued except in the composing room where claimant was employed; that during most of the period of the strike there were only two pickets at each of the two plant entrances, and there was no violence or threat of violence; and, finally, that claimant did not receive "strike benefits" as a result of his small contribution to the striking union, but received benefits in accordance with the basic provision of the union constitution and by-laws.

II.
The background facts are these: Claimant was employed as a proofreader in the composing room of Hadden Craftsman, Inc., a subsidiary of International Textbook Company, in Scranton, Pa. He was a member of Scranton Typographical Union, Local 112. There were 12 unions representing various groups of employees at the company's plant. Two of them  Local 112 and Mailers Union Local 124  were affiliated with the International Typographical Union. They and Supplementary Mailers Local 124 each had separate contracts with the company. The Mailers and Supplementary Mailers Locals had the same officers, who had negotiated and signed the contracts on behalf of both. Members of Local 112 worked in the composing room; members of the two Locals 124 worked in the mailing room, attending to incoming and outgoing mail and carrying on packaging and shipping operations.
The contract between Local 112 and the company contained a clause that "no employee covered by this contract shall be required to cross a picket line established because of an authorized strike by any other subordinate union of the International Typographical Union." The contract of Supplementary Mailers Local 124 had a similar clause; it provided that no member would be required to cross a picket line established because of an authorized strike by Mailers Local 124.
*306 On November 21, 1955 the members of the Mailers Local went out on strike because of failure to negotiate a new contract with their employer. The members of Supplementary Mailers Union 124 also failed to report, thereby causing a stoppage of work in the mailing room. The strike continued until February 28, 1956.
At the time the strike was called claimant's union, Local 112, held a meeting and voted not to cross the picket line established by striking Local 124. Thereupon, all its members, including claimant, remained away from work during the entire period of the strike. The result of their action was a complete stoppage of work in the composing room. This had a vital effect upon the operation of the entire plant; the composing room supplied the type and plates for the press room, and the company therefore found itself in a position where it could not accept new work. It had to continue with whatever work was on hand.
There were two employee entrances to the plant, one on each of two intersecting streets. Throughout the strike the maximum number of pickets at each entrance was two. Members of nine other unions, numbering some 1,300 of the 1,400 employees working in the plant, crossed the picket line without any interference and continued to work throughout the strike. The picketing was peaceful; the strike was without violence or threat of violence. There was no barrier to claimant's crossing the picket line and going to work, had he chosen to do so.
Claimant was scheduled to return to work at 4 P.M. on Monday, November 21, 1955. At about 10:30 A.M. that morning he received a letter from the company reading:
"Dear Mr. Soricelli:
This morning you did not report for work. This is to inform you that the company is open for its normal operations, and work is available for you.
 Sincerely yours,
 Robert Vogelbacker,
 Personnel Director"
*307 Claimant admitted that his union leaders had not told him not to cross the picket line, but that he, in the exercise of individual judgment, had voluntarily refused to do so. He said, "it was my disposition not to cross the picket line"; "I wouldn't have crossed the picket line under any conditions, whether we had taken a vote or not. * * * This is a matter of principle." He also admitted there were no threats of violence, no one stopped him; in refusing to cross the picket line he was guided "strictly by the dictations of my own conscience."
While the strike was in progress, and just before Christmas, members of claimant's Local 112 made voluntary contributions to Mailers Local 124, and this money was turned over to Supplementary Mailers Local 124, consisting of women. The total collected was about $200, and claimant's contribution was $1. He testified he had contributed out of sympathy, and volunteered the thought that perhaps he should have contributed more generously.
Members of Local 112 were paid what claimant called defense benefits by the International Typographical Union, Soricelli receiving 60% of his weekly pay. In addition thereto, they received benefits from their local union toward the end of the strike.
Claimant returned to work with the same employer after the strike ended on February 28, 1956.

III.
On this appeal claimant first argues that proper procedures were not followed at the hearing and rehearing. He claims his testimony was obtained "in a deceitful manner, involving premeditated and deliberate chicanery." Prejudicial questions were put to him and there was "an attempt to manufacture fake and fraudulent evidence." We have carefully examined the transcripts of the hearings and find not even a scintilla to support these charges. As we have already said, every consideration was given claimant to establish his case, to air his suspicions, and to enlarge the record so as to afford his claim the broadest possible support.
*308 In his brief claimant repeats the charge that he never requested that the Oliver hearing be used as part of the record in his own case. However, in the very same paragraph he admits he did agree to this inclusion "because he trusted in the judgment" of the referee and "did not wish to hamper efforts in presenting his case before the State of New Jersey."
Claimant next argues that the findings of fact are not sustained by competent and substantial testimony. His complaint here is that members of International Textbook Company's administrative staff testified to matters not strictly within the sphere of the "corporate framework." Suffice to say, the personnel manager and the job evaluation analyst who testified were administrative personnel intimately a part of the company's day-to-day functioning organization. They had direct knowledge of the subject matter of their testimony, and that testimony was material and pertinent. Our examination of the hearing records clearly discloses that the Board's findings were supported by competent and more than substantial evidence.

IV.
We come, then, to plaintiff's contention that his refusal to cross the picket line did not constitute a participation in the labor dispute, within the purview of N.J.S.A. 43:21-5(d), so as to lead to disqualification for unemployment benefits. This section of the statute provides that
"An individual shall be disqualified for benefits:

* * * * * * * *
(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; provided, that this subsection shall not apply if it is shown that:
(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute * * *."
*309 The facts we have recited demonstrate that there can be no question but what there was a labor dispute at plaintiff's place of employment, beginning on Monday, November 21, 1955, and resulting in a stoppage of work in the mailing department and directly affecting the operations of the entire plant. When the members of Mailers Local 124 went out on strike, the members of claimant's Local 112, together with the members of Supplementary Mailers Local 124, ceased work to add their strength to the cause of the strikers. We restate the uncontradicted testimony: there were only two pickets at each of the two entrances to the plant; 1,300 members of nine other unions crossed the picket line and continued work without interference; the strike was a quiet one, with no violence, threat of violence, or anything to restrain claimant from returning to work. He nonetheless refused to cross the picket line, and this notwithstanding the fact that he received a letter from the employer advising him that work was available.
It is now established law in this State that voluntary refusal to cross a picket line constitutes a contributing participation in the labor dispute, and must result in disqualification for unemployment compensation benefits, under N.J.S.A. 43:21-5(d). Schooley v. Board of Review, 43 N.J. Super 381, 384 (App. Div. 1957), and the cases there cited. To these may be added the many cases appearing in the annotation in 28 A.L.R.2d 333-337 (1953), and in A.L.R.2d Supp. Serv., p. 1618 (1957) and 1957 mid-year pamphlet, p. 160.
Of course, where it is shown that failure to pass a picket line was due to a reasonable and justifiable fear of harm to the claimant in the existing conditions, his failure to do so is deemed involuntary. Steamship Trade Ass'n of Baltimore v. Davis, 190 Md. 215, 221, 57 A.2d 818 (Ct. App. 1948).
As was said in Schooley, 43 N.J. Super. at page 385, to escape the statutory disqualification the burden was upon claimant to establish that his failure to pursue his employment was essentially attributable to a real and genuine fear *310 to do so, rather than for reasons of conscience and a desire to abide by the traditional principles and policies of union solidarity. He did not discharge that burden. His failure to pass through the picket line must therefore be regarded as voluntary inaction on his part.
At the oral argument claimant projected for the first time the suggestion that there had been a "lock out" by the employer. Not a single fact in the record supports that claim, directly or inferentially.

V.
We turn our attention for the moment to the provision in the contract between the employer and Local 112 that no employee covered by the contract "shall be required to cross a picket line established because of an authorized strike by any other subordinate union of the International Typographical Union." The purpose and intent of our Unemployment Compensation Act cannot be modified by a labor-management agreement which would render the statute or any provision thereof ineffectual. In enacting that law the Legislature, as a guide to the interpretation and application of the act, declared the public policy of this State to be that
"* * * economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. * * * The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state requires the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed after qualifying periods of employment."
The Unemployment Compensation Law was enacted for beneficent and humane purposes, in order to promote *311 the common good and the general welfare. The statute is designed to serve the general public interest, and not merely the individual welfare of the unemployed. Bogue Electric Co. v. Board of Review, 21 N.J. 431, 435 (1956); Campbell Soup Co. v. Board of Review, 13 N.J. 431, 436 (1953).
Legislation intended to secure general objectives of public policy or morals cannot be circumvented by private agreements. Cf. Quick v. Corlies, 39 N.J.L. 11, 12 (Sup. Ct. 1876), cited with approval in Freeman v. Conover, 95 N.J.L. 89, 92 (E. & A. 1920); City Hall B. & L. Ass'n v. Florence Realty Co., 110 N.J. Eq. 12, 14 (Ch. 1932). The statutory scheme commits the administration of the eligibility and disqualification provisions of the Unemployment Compensation Act to the Division of Employment Security. The purpose of these provisions is to protect the Unemployment Compensation Fund against claims of individuals who would prefer benefits to jobs. Krauss v. A. & M. Karagheusian, 13 N.J. 447, 455 (1953). Unemployment benefits are not allowable unless the claimant meets the conditions for eligibility and is not disqualified.
Were we to hold with claimant in his contention that he is, in the attendant circumstances, entitled to unemployment benefits, we would give the quoted union-management contract clause the force of permitting non-striking employees voluntarily to remain out of work in support of the strikers and at the same time receive benefits, notwithstanding the fact they are disqualified under the statute. This, in effect, would be using the Unemployment Compensation Fund to finance a labor dispute. To give the clause such an application would be in violation of the public policy declared by the statute.

VI.
We may observe, finally, that claimant's contribution to a fund used by Mailers Local 124 in support of a labor dispute which caused a stoppage of work constitutes financing a labor dispute within the purview of N.J.S.A. 43:21-5(d). That alone would disqualify claimant from benefits. It is *312 undisputed that when Mailers Local 124 went out on strike, Supplementary Mailers Local walked out in sympathy, as did claimant's Local 112. It is also undisputed that members of Local 112 individually gave voluntary contributions in aid and support of striking Local 124, which turned the proceeds over to the women of the Supplementary Mailers Union. As noted, claimant contributed $1 toward this fund.
Whether claimant's contribution was small or large is not the test for disqualification under N.J.S.A. 43:21-5(d). The legislative language is explicit; we may not by construction lessen or broaden the scope of a statute when the intention of the Legislature is, as here, clearly and plainly expressed. Gerber v. Board of Review, 20 N.J. 561, 566 (1956). Any financing of a labor dispute disqualifies a claimant from receiving unemployment benefits. To hold otherwise would be to defeat the object and purpose for which the Unemployment Compensation Act Law was enacted.
But this aside, it is to be recalled that the members of Local 112, including claimant, were employed in the company's composing room. Assuming that claimant did not directly finance the labor dispute, he nevertheless would be disqualified under subdivision 2 of N.J.S.A. 43:21-5(d) by reason of belonging to the grade or class of workers employed at the premises at which the stoppage occurred and who were financing the dispute through their contributions to a fund raised by Local 112 and turned over to the striking Mailers Local 124, for distribution to the Supplementary Mailers group. In Ford Motor Co. v. New Jersey Dept. of Labor, etc., Board of Review, 5 N.J. 494, 506 (1950), the court held that participation in the labor dispute, either directly or vicariously through membership in the same grade or class of workers participating therein at the premises at which the stoppage occurs, is of the essence of the statutory disqualification.
Affirmed.