63 N.J. Super. 75 (1960)
163 A.2d 723
JULIUS MARCZI ET AL (TOTALLING 43), PLAINTIFFS-APPELLANTS,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY AND RIEGEL PAPER CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1960.
Decided September 19, 1960.
*77 Before Judges GOLDMANN, FREUND and HETFIELD.
Mr. John Dale Seip argued the cause for appellants.
Mr. Edward A. Kaplan argued the cause for respondent Board of Review (Mr. Clarence F. McGovern, attorney).
Mr. C. Ryman Herr, Jr., argued the cause for respondent Riegel Paper Corporation (Messrs. Herr & Fisher, attorneys).
*78 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal by 43 claimants from the decision of the Board of Review, Division of Employment Security, Department of Labor and Industry, affirming a decision of the Appeal Tribunal modifying a determination of the Division and holding claimants disqualified for unemployment benefits under N.J.S.A. 43:21-5(d) from Sunday, March 8, 1959, through Saturday, March 21, 1959.
Defendant Riegel Paper Corporation has approximately 1,510 employees in its four New Jersey plants at Milford, Warren Glen, Hughesville and Riegelsville. Claimants are employed in the company power houses at these locations and are members of the International Brotherhood of Electrical Workers, AFL-CIO, Local 1940 (IBEW), the bargaining agent for the approximately 55 men so employed. The United Paper Makers and Paper Workers Union, AFL-CIO, Local 712 (UPMPW), represents about 1,100 production and maintenance workers in the company's employ.
On Friday, February 27, and Saturday, February 28, 1959, as the climax to a dispute between the company and its production and maintenance workers, UPMPW called a strike and set up picket lines at the entrances to the four plants. There was mass picketing, and claimants, in violation of their contract, stopped reporting for work on Tuesday, March 3, 1959, and did not return until the end of the strike on March 19, 1959. The company meanwhile obtained a temporary restraining order on March 6, which enjoined mass picketing or picketing in close formation at the plant entrances or upon the public streets immediately adjacent thereto, but permitted peaceful picketing by not more than six pickets, spaced at least ten feet apart, at each entrance. The order further prohibited the hindering or obstructing of office, clerical, management and supervisory personnel, as well as employees, from entering or leaving the company's plants for the purposes of working or doing business. The *79 company mailed a copy of the restraining order to all of its employees by certified mail on Saturday morning, March 7. Beginning Monday, March 9, and continuing thereafter throughout the period of the labor dispute, the picketing proceeded in strict compliance with the restraining order. Work was available during the entire period, but claimants, although requested by the company to report for work, stayed away.
All supervisory and clerical employees, as well as several hourly rate employees, entered the plant on Monday, March 9, and continued at their work thereafter. Some of the production and maintenance workers also returned to work that day, with additional numbers of their co-workers returning to work each day thereafter. Full production was resumed at the plants on Thursday, March 19. During the progress of the strike, trucks and freight cars were loaded at the plants and finished products shipped without interference.
The initial determination of the Division, made upon the information then before it, was that claimants were eligible for unemployment benefits without disqualification for the period March 3 through March 21, 1959, because they were afraid to go to work. The Division investigator found there was a reasonable basis for such fear. On appeal by the employer, the Appeal Tribunal, after a full hearing, modified the Division's determination. It held that from March 3 through March 7, the date copies of the restraining order were mailed to all employees, the mass picketing and threats gave the power house employees good reason to believe that any effort to cross the picket lines might result in personal injury, so that no disqualification arose for that period. The Appeal Tribunal further held that claimants had failed to establish that their failure to report to work from March 8 on was due to a genuine fear for their personal safety, and they were therefore disqualified for benefits under N.J.S.A. 43:21-5(d) from March 8 through March 21, 1959. On appeal by claimants to the Board of Review, the Board *80 affirmed the decision of the Appeal Tribunal on the basis of the record below.
Claimants contend that they did not participate in or finance, nor were they directly interested in the labor dispute which caused the work stoppage, within the meaning of N.J.S.A. 43:21-5(d)(1). Further, they allege that their refusal to cross the picket lines was solely due to fear of injury to themselves, their families and property, so that their refusal was entirely involuntary. The final contention advanced is that the Board of Review, in not granting claimants a hearing on their appeal from the Appeal Tribunal, denied them due process of law.
N.J.S.A. 43:21-5(d) provides in significant part that:
"An individual shall be disqualified for benefits:

* * * * * * * *
(d) for any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; provided, that this subsection shall not apply if it is shown that:
(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *."
Division Regulation 23.01, here applicable, provides:

"Regulation 23.01 Week of Disqualification:
(a) A week with respect to any disqualification arising under Section 43:21-5 of the Unemployment Compensation Law shall be a calendar week."
It is now beyond question that the primary purpose of the Unemployment Compensation Law, N.J.S.A. 43:21-1 et seq., is to relieve employees from economic insecurity following upon involuntary unemployment. Bogue Electric Co. v. Board of Review, 21 N.J. 431, 435 (1956). *81 Equally well established in our law is the principle that voluntary refusal to cross a picket line constitutes a contributing participation in the labor dispute, and must result in disqualification for unemployment compensation benefits under the quoted statute. Soricelli v. Board of Review, 46 N.J. Super. 299, 309 (App. Div. 1957); Schooley v. Board of Review, 43 N.J. Super. 381, 384 (App. Div. 1957). And see Annotation, 28 A.L.R.2d 333-337 (1953) and 2 A.L.R.2d Supplement Service 2278 (1960). We also held in Soricelli and Schooley that failure to pass a picket line because of a reasonable and justifiable fear of harm to the claimant in the existing conditions will not be regarded as voluntary inaction disqualifying a claimant from benefits under the act. However, the claimant has the burden of establishing that his failure to cross the picket line and pursue his employment was essentially attributable to a real and genuine fear of harm, rather than for reasons of conscience or a desire to abide by the traditional principles and policies of union solidarity. Claimants here did not discharge that burden.
We find that the conditions prevailing at and in the vicinity of the company's plants after the issuance of the restraining order on March 6, and thereafter until March 19, 1959, when claimants returned to work, were not such as to create in any of them a real and genuine fear of harm had they attempted to cross the picket lines to pursue their employment. The testimony before the Appeal Tribunal clearly demonstrates that after the restraining order issued there was no justifiable excuse for their failure, or the failure of any member of the IBEW, to pass through the lines and return to work. There were no acts of violence or threats, and the picket lines at all the plants were maintained in obedience to the injunctive order. The testimony of the company's personnel director, as well as of the three union officials who testified, demonstrates this aspect of the matter quite clearly. As already noted, clerical and supervisory employees crossed the picket lines and continued at their *82 work throughout the strike. A number of the production and maintenance workers whose union called the strike also returned to work after the issuance of the injunctive order. Further, trucks and freight cars were loaded at the plants with finished products for shipment while the strike was in progress.
The president of the IBEW local, testifying with respect to the period prior to the issuance of the restraining order, said that when he was leaving the plant on Tuesday afternoon, March 3, he was told by members of the United Paper Makers and Paper Workers Union that "nobody was going in any more." He could not identify the men. He further testified that his wife told him that while he was away from home on Sunday afternoon, March 8, men in three cars drove to his yard and inquired as to where he was. He made no effort to ascertain their identity or the purpose of their visit. He said he had received four or five telephone calls on March 3, and when asked "What did they say?" he answered, "They just stated they wanted me to stay out." He told no one of these calls. The witness also stated that he received 15 or 20 calls of a similar nature during the course of the strike, but reported them to no one  either to the union or the police. He also told of reading an account in a newspaper that on the Saturday before the strike ended on March 19, someone punctured tires and broke the glass in two cars parked by the plant gate, and that a window had been broken in one worker's house.
Another of claimants' three witnesses, the recording secretary of the local, testified that the reason he did not report for work was because he received two phone calls (the callers were not identified by him): the first on March 3 informing him that none of the power house workers should or could go in, and another in the second week of the strike when he was told to get the firemen out of the Riegelsville and Hughesville plants. He also testified to the peaceful picketing and that he entered the plant on two occasions to get his pay check.
*83 The third witness, vice-president of claimants' union, said he did not return to work because of several phone calls, the first on March 6 advising him to stay out because something would happen to his personal property. It is not clear whether he or his wife received these calls; in any event, he apparently did not consider them as threats since he did not report them to anyone, nor did he investigate or identify the callers.
The mere statement by a claimant that his refusal to cross the picket line was due to fear of harm is not in itself sufficient to demonstrate that his unemployment was involuntary  certainly so in a situation where there was not a single act of violence subsequent to the injunctive order which might lead one reasonably to believe that the claimant would have been in physical danger had he attempted to cross the picket line. The proofs establish that the issuance of the restraining order had a completely quieting influence on the strikers. Such minor incidents as occurred thereafter were, however assessed, clearly insufficient to instill in the claimants any real and genuine fear of harm. Fear of violence must be real, not nebulous.
The standard of judicial review in a case like this was set out in Berry, Whitson & Berry v. Division of Employment Security, 21 N.J. 73, 77 (1956). It was there pointed out that the statutory scheme commits the determination of the question whether there was truly involuntary unemployment to the Division of Employment Security and its administrative appeal tribunals.
"* * * The test of judicial review is not whether we would come to the same conclusion if the original determination was ours to make, but rather whether the fact-finder could reasonably conclude upon the proofs that the claimant's decision to quit was in good faith compelled by considerations which, though personal, were substantial and real and not trivial or frivolous."
We find the determination of the Board of Review entirely reasonable in the light of the record. As we said in Schooley v. Board of Review, above, 43 N.J. Super., at page 386, the *84 factual ascertainment of the motive, intent, purpose and causation of claimants' cessation of work was appropriately the quasi-judicial function of the Board of Review. Here, as in that case, the competent and relevant evidence, and the derivative inferences to be drawn therefrom, were sufficiently substantial to support its factual findings and resultant decision.
Claimants insist that in spite of the fact that a full hearing was held before the Appeal Tribunal, the failure of the Board of Review to hold a hearing amounts not only to a violation of N.J.S.A. 43:21-6(e), but a denial of due process. There is no merit to either contention.
N.J.S.A. 43:21-6(e) provides:
"The board of review may on its own motion affirm, modify, or set aside any decision of an appeal tribunal on the basis of the evidence previously submitted in such case, or direct the taking of additional evidence, or may permit any of the parties to such decision to initiate further appeals before it. The board of review shall permit such further appeal by any of the parties interested in a decision of an appeal tribunal which is not unanimous and from any determination which has been overruled or modified by any appeal tribunal. The board of review may remove to itself or transfer to another appeal tribunal the proceedings on any claim pending before an appeal tribunal. Any proceeding so removed to the board of review shall be heard by a quorum thereof in accordance with the requirements of subsection (c) of this section. The board of review shall promptly notify the interested parties of its findings and decision."
From this it is clear that the Board may affirm the Appeal Tribunal's decision on the basis of the record before the latter administrative tribunal. Only where it removes to itself a claim pending before the Appeal Tribunal need there be a hearing. The statutory purpose is clear: at least one hearing should be had, either before the Appeal Tribunal, if the appeal is heard there, or before the Board of Review, if that body exercises the power given it by statute to remove a proceeding to itself. The statutory scheme accords with the constitutional principle that due process requirements are satisfied if, at any time before the administrative order *85 becomes effective, fair hearing is afforded by administrative or judicial action. N.J. Zinc Co. v. Board of Review, 25 N.J. 235, 239 (1957).
Claimants contend that the Board of Review did not consider the record of the hearing before the Appeal Tribunal. The Board in its findings of fact and opinion stated:
"The record developed by the Appeal Tribunal in this case and the allegations of the appellant have been carefully examined.
It is found that the record supports the findings made by the Appeal Tribunal, that the appellant was given a full and impartial hearing, and that no material new evidence has been offered. The Appeal Tribunal is the proper forum for the trial of facts. Where the record shows that a full opportunity for the development of all material facts has been afforded there is no valid ground for a retrial."
It is clear that the Board of Review made its decision on the basis of the record.
The fact that the Board did not on this appeal submit a transcript of the testimony as taken before the Appeal Tribunal cannot sustain the inference that the testimony was not part of the record on appeal before the Board. It is claimants' responsibility, and not the agency's, to furnish this court with a transcript of the testimony. R.R. 4:88-8(a).
Affirmed.