FORD MOTOR COMPANY, APPELLANT, v. NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, DIVISION OF EMPLOYMENT SECURITY, BOARD OF REVIEW, JOHN KIERNAN, GEORGE BOHACS, INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW-CIO), LOCAL 906, UAW-CIO, LOCAL 980, UAW-CIO, GENERAL CABLE CORPORATION, AND INTERNATIONAL SMELT REFINING CO., RESPONDENTS.

Argued September 25 and October 2, 1950—
Decided November 6, 1950.

496

*Mr. Josiah Stryker* argued the cause for appellant. *Mr. Walter F. Waldau,* of counsel. *Mr. Eugene L. Lora,* attorney.

*Mr. Clarence F. McGovern* argued the cause for the respondent Board of Review, Division of Employment Security, Department of Labor and Industry.

*Mr. Samuel L. Rothbard* argued the cause for the remaining respondents, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW-CIO), *et al. Mr. Abraham L. Friedman,* of counsel. *Messrs. Rothbard, Harris & Oxfeld* and *Mr. Harry J. Weiner,* attorneys.

The opinion of the court was delivered by

HEHER, J. The issue here is whether certain employees of the Ford Motor Company at its New Jersey assembly plants in Edgewater and Metuchen are by force of *R. S.* 43:21–5(d) disqualified for unemployment compensation for the period from May 11, 1949, to and including June 7, 1949, when the New Jersey plants were shut down; and this, in turn, depends upon whether the work stoppage resulted from a labor dispute at the "factory, establishment, or other premises at which" the workmen were "last employed," for there is such disqualification in that event unless the workmen come within the provisions of subdivisions (1) and (2) of that section.

The Appellate Division of the Superior Court sustained an allowance of benefits to the respondent John Kiernan, an employee of Ford at its Edgewater plant at the time in question, and the respondent George Bohacs, then employed at its Metuchen plant; and on Ford's motion this court certified the cause for appeal. Some 4,000 of Ford's New Jersey employees are in the same category.

The essential inquiry concerns the meaning of the phrase "factory, establishment, or other premises." By the cited section of the statute, the individual is disqualified for benefits—

"(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; *provided*, that this subsection shall not apply if it is shown that: (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; *provided*, that if in any case in which (1) or (2) above applies separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises."

Ford is a Delaware corporation engaged in the manufacture and sale of Ford, Mercury and Lincoln automobiles. Its principal office and manufacturing plant are located at Dearborn, Michigan. There, it manufactures the "major parts" which are assembled into automobiles at its various assembly plants; and there it also maintains a central department for the purchase of parts which it does not itself manufacture, 60% of the whole, which are first shipped to Michigan and thence to the assembly plants. These assembly plants, it is said, are maintained to secure the benefit of the more favorable freight rates for the shipment of parts as compared with shipping charges for the completed unit. The Metuchen plant is used exclusively for the assembling of parts shipped from Dearborn into automobiles; the Edgewater plant is devoted to the same use, but there trucks are also boxed for export and a stock of parts and accessories is kept for dealers.

The Company also has factories and assembly plants abroad. Its operative units are grouped into seven "divisions." Two divisions are primarily concerned with the assembly process; one division operates a depot for automobile parts and accessories; another division manages the Company's business in foreign countries; and three divisions fabricate, manufacture and ship automobile parts to the assembly plants. The Metuchen plant is one of four plants comprising the Lincoln-

Mercury Division; the Edgewater plant is one of fifteen plants constituting the Ford Assembly Division. The General Production Division includes the "Rouge," a term applied to Ford's multiple plant at Dearborn.

The plant managers at Edgewater and Metuchen exercise no control over production quotas. Automobile parts are shipped from Dearborn pursuant to production schedules established for such plants by the Dearborn office of the Company. The local plant management has no control over the shipment of parts; nor is it authorized to procure parts from sources other than Ford's Dearborn plant. The shipment of parts from Dearborn is made on a schedule which affords not more than a six- or seven-day supply at these assembly plants. The local plants are under the direction and control of the central executive office at Dearborn. The automobiles assembled at Edgewater and Metuchen are sold by the sales division of Ford in New York City. The funds needed to defray the operating expenses of these local plants, including payrolls, are forwarded weekly by the Dearborn office. There is one merit rating and unemployment compensation account with the State of New Jersey for these two assembly plants. This is in keeping with *R. S.* 43:21–19(g). The hiring and dismissal of employees are within the province of the local plant management, although subject to the approval of the Dearborn office. In a word, it is said that all the local assembly plants "are closely integrated with the Michigan plants and form one production system centered in Dearborn, Michigan."

All New Jersey employees of Ford, with minor exceptions, are members of the local union of International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO, known as UAW-CIO, No. 906 at Edgewater and No. 980 at Metuchen; pursuant to closed-shop provisions of the master labor contract with the Union. Membership in the local union constitutes membership in International. Loss of union membership requires discharge from employment. With some exceptions, International is the exclusive

bargaining agent for all these employees; and its negotiations in their behalf are usually on a company-wide basis with Ford's representatives at Dearborn. International's constitution conditions the local union's right to strike upon approval of International's executive board; but a local strike may be called only by the local union itself, after that course of action has been sanctioned by two-thirds of the membership voting on the question by secret ballot. International is empowered only to call a general strike within the industry after approving action is taken "by a referendum vote of the membership." International has more than 900 autonomous locals throughout the United States, representing not only employees of Ford but of many other employers as well.

On March 11, 1949, the Union gave Ford a written notice of dispute regarding the speed of operations on certain assembly lines in the "B" Building at the Rouge. Similar notices of dispute as to operating speed on assembly lines were given to Ford by the Union on March 21, 1949, with respect to the assembly plant at Los Angeles, on April 14, 1949, with respect to the Lincoln assembly plant at Detroit, and on April 22, 1949, with respect to the Lincoln-Mercury assembly plant at Metuchen. On May 8, 1949, a strike was declared at the Rouge and the Detroit Lincoln plants, and the result was a cessation of all operations at those plants until June 2nd ensuing. The strike at these plants was authorized by the local unions and approved by the executive board of International. Neither of the New Jersey locals took a strike vote and neither authorized or approved the strike at the Michigan plants, or participated therein directly or indirectly. Indeed, the workers at these plants continued in service until laid off for want of material. Ford concedes that "As a result of this strike, the New Jersey plants were unable to receive further supplies or materials from Michigan and thus were forced to discontinue operations some six days later." The contention of respondents is that the Michigan strike and the underlying dispute were purely local and involved only the members of the Michigan locals. But Ford maintains that the basic

issue of operational speed "was not local but company-wide, involving the master contract provision applicable to all employees at all locations;" and that the subsequent arbitral settlement of the controversy operated to the advantage of the workers at all of Ford's assembly plants in the United States. Reference is here made to the refusal of International to ".localize" the strike by confining it to Building "B" in Dearborn, and thus to permit "the recall of 72,000 members in Detroit and 25,000 Ford employees in assembly plants throughout the country." International's response to this proposal was that the Ford workers "are equally conscious of the strength their solidarity gives them and of the economic pressure it is bringing to bear on the Company;" that they "recognize also that while only the "B" Building and the Lincoln workers are involved in the immediate dispute they are all directly affected by the basic principle." It was conceded below that the settlement was in terms made applicable only to the Michigan plants directly involved in the strike.

Each local union pays a per capita tax to International, part of which, five cents per month, is set aside as International's "strike fund, to be drawn upon to aid Local Unions engaged in authorized strikes and in cases of lockout;" but it seems to be conceded that no part of this fund was used to finance the Michigan strike. It is said merely that "the fund was available for such purpose."

It is the insistence of Ford that the New Jersey assembly plants "are so functionally integrated and synchronized with the Michigan plants as to constitute a single establishment" within the intendment of $R. S. 43:21-5 (d)$, and therefore the stoppage of work at these plants was due to a disqualifying labor dispute. The reasoning is that each plant is "an essential part" of Ford's manufacturing and distribution facilities; that without the plant at Dearborn, "the assembly plants would have no existence and would have no functions to perform;" and that the New Jersey assembly plants "have substantially but one function to perform, namely, that of assembling into complete motor vehicles the parts shipped"

from Dearborn, and they "are in reality as much a part of the Ford establishment as the assembly plant located at Dearborn and perform the same functions," and so these plants, "functionally integrated with, completely dependent upon, and fully managed and controlled as part of the main plant in Michigan, together constitute an establishment within the purview of the Act."

The standard of "functional integration" is not to be found in the legislative expression. The statutory sense of the term "establishment" is not embracive of the whole of Ford's far-flung enterprise as a single industrial unit. It has reference to a distinct physical place of business. Such is its normal usage in business and in government. *A. H. Phillips, Inc., v. Walling,* 324 *U. S.* 490, 65 *S. Ct.* 807, 89 *L. Ed.* 1095 (1945). "Establishment" is defined as the "place where one is permanently fixed for residence or business;" also, "an institution or place of business." *Webster's New International Dictionary, 2nd ed.* The force of the term is on well-settled principles restrained by the accompanying words and the declared policy of the statute and the means employed for its execution. Ordinarily, the coupling of words denotes an intention that they shall be understood in the same general sense. The natural, ordinary and general meaning of terms and expressions may be limited, qualified and specialized by those in immediate association. Words of general and specific import take color from each other when associated together, and thus the word of general significance is modified by its associates of restricted sense. The general word is qualified by the particular word. *Jersey Central Power and Light Company v. State Board of Tax Appeals,* 131 *N. J. L.* 565 (*E. & A.* 1944). The principle is expressed in the doctrine of *noscitur a sociis* and the variant rule of *ejusdem generis.* A word is known from its associates.

If "establishment" be given the broad significance urged by Ford, then the words "factory" and "other premises" would have no meaning whatever. It is to be presumed that the Legislature has not made use of superfluous words. This

is the basis of the cited maxim, designed as an aid to construction where the expression is of doubtful meaning. *Edwards v. Mayor and Council of the Borough of Moonachie,* 3 *N. J.* 17 (1949). "Factory" is defined as "A building, or collection of buildings, usually with its equipment or plant, appropriated to the manufacture of goods; the place where workmen are employed in fabricating goods, wares, or utensils; a manufactory." "Premises" signifies "the property conveyed in a deed; hence, in general, a piece of land or real estate; sometimes * * * a building or buildings on land." *Webster's New International Dictionary, 2nd ed.* In its primary sense, the word "factory" has reference to a place where goods are fabricated, while "establishment" and "other premises" comprehend places for the transaction of business and other pursuits not in the category of a manufactory. The phrase " 'factory, establishment or other premises' takes color, not from 'establishment' as the plaintiff would have it, but rather from the word 'factory.' In common parlance the latter ordinarily means a single industrial plant. No one, for instance, would speak of the many units of General Motors Corporation, scattered as they are throughout several states, as a factory. * * * By embodying in the phrase the word 'establishment,' the legislative intent was to broaden the field of operation and extend the beneficence of the act to those employed in places other than factories," such as banks, theaters, hotels, mercantile houses and other places not of the factorial class. *General Motors Corporation v. Mulquin,* 134 *Conn.* 118, 55 *A.* 2d 732 (1947). In common acceptation, "factory" is a "place" where material is fashioned, by human labor and machinery, for use in a different form. *Red Hook Cold Storage Co. v. Department of Labor,* 295 *N. Y.* 1, 64 *N. E.* 2d 265 (1945).

In the absence of an explicit indication of a special meaning, words are to be given their common usage. Even where by amendment of a similar provision, the word "establishment" alone was used to define the statutory class, it was held that the change in terminology did not enlarge or

diminish the group, and the determinative inquiry is whether "the unit under consideration is a separate establishment from the standpoint of employment and not whether it is a single enterprise from the standpoint of management or for the more efficient production of goods." *Nordling v. Ford Motor Company,* —— *Minn.* ——, 42 *N. W.* 2d 576 (1950). This case concerned a stoppage of work at Ford's plant in St. Paul, Minnesota, as a result of the same labor dispute in Michigan involved in this proceeding; and the holding was that, while the St. Paul branch "is highly integrated with other units of the company for purposes of efficient management and operation," it is "separate insofar as the employees are concerned for the purpose of employment," and that "Employment under the act relates to services performed within the state or localized here." And in *Tucker v. American Smelling & Refining Co.,* 189 *Md.* 250, 55 *A.* 2d 692 (1947), the Court of Appeals of Maryland ruled that a copper smelter in Utah and a Baltimore refinery, which with sixteen other plants (mines, smelters and refineries) had a common ownership and management, were not one "establishment" within the purview of the statutory provision here under review, and so a stoppage of work at the Baltimore refinery due solely to a failure of copper supply from the strike-bound Utah smelter, did not serve to disqualify the unemployed workers at Baltimore for benefits. There, also, the local unions were members of an "international" C. I. O. union, under the same general relationship to the employer and to one another as exists here.

Appellant cites in support of the contrary interpretation *Chrysler Corporation v. Smith,* 297 *Mich.* 438, 298 *N. W.* 87 (1941); *Chrysler Corporation v. Appeal Board of Michigan Unemployment Compensation Commission,* 301 *Mich.* 351, 3 *N. W.* 2d 302 (1942); *certiorari* denied, 317 *U. S.* 635, 63 *S. Ct.* 44, 87 *L. Ed.* 512 (1942), and *Spielmann v. Industrial Commission,* 236 *Wis.* 240, 295 *N. W.* 1 (1940). But the cases are not in point. There, "establishment" alone was used to define the statutory class; and there were geographi-

cal proximity and other factors which in the judgment of the court made the totality of members one "establishment," so that a labor dispute at one plant would include all as a unitary whole.

■ Here, geographical separation and the nature of the function combine to make the New Jersey plants distinct establishments within the intendment of the statutory provision under consideration. Parts are there assembled into automobiles ready for regional market distribution. This localization of the plants is an essential part of Ford's own economy. The plants constitute separate factories or establishments. While integrated with the central plant, there is a physical and functional separation, for this purpose, which gives the local plants the status of a factory or an establishment in the statutory sense.

■■ The view *contra* is not a realistic appraisal of the statutory policy of relief against involuntary unemployment, in the interest of general social and economic security. Protection against the hazards of economic insecurity is afforded by the compulsive setting aside of unemployment reserves for the benefit of persons unemployed after qualifying periods of employment, though able and available for work. *R. S.* 43:21–2. Contributions to New Jersey's unemployment reserves are made only for Ford's employees at the local plants; and only those of Ford's employees are eligible for benefits from the fund thus created. *R. S.* 43:21–7, 43:21–9. The spirit of a statute gives character and meaning to particular terms. *Valenti v. Board of Review of Unemployment Compensation Commission,* 4 *N. J.* 287, 72 *A.* 2d 516 (1950). The statutory concept is an employment unit within the State, and compensation where the unemployment is involuntary. There is disqualification for benefits under the particular clause only where the unemployment is the result of a labor dispute at the factory, establishment, or other premises where the claimant "is or was last employed," and not then if individual non-participation is shown as provided in the statute. Physical place is the major element in this definition. The

sense of the phrase "factory, establishment, or other premises" is revealed by the provision of subsection (d) of *R. S.* 43:21–5 that if in any case in which either of the nonparticipation clauses (1) or (2) applies, "separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises." A work stoppage due alone to economic dependence upon the participants in a labor dispute beyond the factory or establishment at which the claimant is or was last employed does not give rise to the statutory disqualification. Participation in the labor dispute, either directly or vicariously through membership in the same "grade or class of workers * * * at the premises at which the stoppage occurs," is of the essence of the statutory disqualification. The use of the word "premises" also suggests the concept of an employment unit within the State. And in *R. S.* 43:21–19(g), which defines the term "employing unit," it is provided that "All individuals performing services within this State for any employing unit which maintains two or more separate establishments within this State shall be deemed to be employed by a single employing unit for all the purposes of this chapter." This provision would be entirely unnecessary if the word "establishment" had the broad connotation now ascribed to it by Ford. It is a contextual refutation of the thesis that "establishment" in section 21:5(d) embraces as a single unit all plants in a vast enterprise like Ford's merely because of "functional integrality" and "synchronization" with the central plant.

There was no participation in the strike here by the local unions or the individual claimants, such as constitutes a bar to relief under the statute. International's failure to "localize" the strike, however that was to be accomplished, is not attributable to the New Jersey locals or to the claimant members; and it is not a relevant circumstance in this inquiry

 

that the standards set by the arbitral award were eventually extended to the New Jersey plants.

The judgment is accordingly affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and ACKERSON—5.

*For reversal*—Justices CASE and OLIPHANT—2.