90 N.J. Super. 150 (1966)
216 A.2d 597
ANGELA BASSO (AND TWO OTHERS), APPELLANTS,
v.
NEWS SYNDICATE CO., INC., AND BOARD OF REVIEW, ETC., RESPONDENTS.
JOHN T. DUFFY (AND EIGHT OTHERS), APPELLANTS,
v.
NEW YORK TIMES SALES, INC., AND BOARD OF REVIEW, ETC., RESPONDENTS.
MARGARET AMATEL (AND SEVEN OTHERS), APPELLANTS,
v.
NEW YORK HERALD TRIBUNE, INC., AND BOARD OF REVIEW, ETC., RESPONDENTS.
MURRAY COHN (AND TWO OTHERS), APPELLANTS,
v.
THE HEARST CORP., NEW YORK DAILY MIRROR DIVISION AND BOARD OF REVIEW, ETC., RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 1965.
Decided January 24, 1966.
*153 Before Judges CONFORD, KILKENNY and LEONARD.
Mr. Irving Leuchter argued the cause for all appellants (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys).
Mr. Edward A. Kaplan argued the cause for respondent Board of Review, Division of Employment Security, Department of Labor and Industry, State of New Jersey.
Mr. William L. Dill, Jr. argued the cause for respondents other than the Board of Review (Messrs. Stryker, Tams & Dill, attorneys).
The opinion of the court was delivered by KILKENNY, J.A.D.
These are appeals by 23 claimants from a final decision of the Board of Review, Division of Employment Security, denying them unemployment benefits for the period between December 8, 1962 and March 31, 1963 on the ground that they were disqualified under N.J.S.A. 43:21-5(d).
So far as pertinent herein, N.J.S.A. 43:21-5(d) provides:
"An individual shall be disqualified for benefits: * * *
(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor *154 dispute at the factory, establishment, or other premises at which he is or was last employed, * * *."
There is a proviso that this subsection shall not apply if it is shown that:
"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *."
The basic facts are not in dispute. The claimants are all members of the New York Newspaper Guild, a trade union local of the American Newspaper Guild, A.F.L.-C.I.O. The Guild is composed of employees of the newspaper publishers who do not belong to one of the craft unions. They were, at the time in issue, employees of publishers of four New York City daily newspapers, commonly referred to as the News, Times, Herald Tribune and Mirror. Their several occupations were principally, and in some cases entirely, within the State of New Jersey, as hereinafter more particularized. On December 8, 1962 a strike was called against the News and Times by the printers' union, New York Typographical Union No. 6. The labor dispute which induced that strike effected a stoppage of work at the establishments of all four newspapers involved herein, the Herald Tribune and Mirror also stopping publication pursuant to an agreement among them as members of the Publishers Association of New York City. As a result of that work stoppage, claimants became unemployed during the 16 weeks while the strike was pending.
The Guild negotiated contracts for its members with each newspaper publisher separately, as contrasted with the printers' union which negotiated labor agreements with all newspaper publishers as a unit through the medium of the publishers' association. The Guild contracts with the publishers had expired on October 30, 1962 and, when there was *155 a failure to negotiate a new agreement, the Guild struck the News on November 2, 1962. That strike was settled on November 8, 1962 by the making of a new contract with the News for a two-year term, from November 1, 1962 to October 31, 1964. The settlement with the News was incorporated into similar contracts between the Guild and the Times, Herald Tribune and Mirror. Thus, at the time in issue the Guild had settled its labor grievances with the newspaper publishers.
Although the Guild and its members were not immediate parties to the labor dispute between the printers' union and the newspaper publishers, having made their own separate contracts a month prior to the printers' strike call, they took an active part in helping the printers' union prosecute its strike to a successful conclusion and were indirectly concerned in one of the issues being negotiated. The Guild had joined with the craft unions in a mutual assistance pact whereby a Labor Unity Committee, composed of representatives of the Guild and craft unions, had been created. There was an inter-union understanding that no new labor contract with the publishers would be approved by any striking union without the prior approval of the Labor Unity Committee. Although the Guild had settled its own earlier strike without such approval, its representatives on the Labor Unity Committee were working in close collaboration with the other craft union representatives on this committee at all times during the prolonged printers' strike.
The active support of the printers' strike by the Guild was further manifested by a directive issued to all Guild members importuning them not to cross picket lines set up by the striking printers and urging them not to accept any employment offered by the newspaper publishers. Guild members refused to cross the picket lines.
The issue involving the Guild and its members was the insistence of the printers upon a common expiration date for all of its labor contracts with the several craft unions and the Guild, instead of the varying termination dates which *156 had induced a greater number of labor problems and work stoppages. This issue was resolved as part of the settlement of the printers' strike by a modification of the Guild contract termination date, extending it from October 31, 1964 to March 31, 1965 and providing for an adjustment upward of salaries to be paid to Guild members for the extended period to coincide with the higher rates won by the printers' union in settling its strike.
Claimants herein take the position that the work stoppage which idled them was not due to a labor dispute "at the factory, establishment, or premises" where they were employed, and thus N.J.S.A. 43:21-5(d) is inapplicable to them. They contend that the labor dispute was "at" the newspaper "establishment, or premises" in New York City, where the printers worked and where picket lines were set, and not at the several places in New Jersey where the Guild members performed their respective duties and where there were no picket lines and no labor dispute, so far as they, as members of the Guild, were concerned. Claimants rely principally upon Ford Motor Co. v. New Jersey Department of Labor and Industry, Division of Employment Security, Board of Review, 5 N.J. 494 (1950), as legal support for their contention.
Some of the claimants herein were newspaper reporters and photographers, whose "beat" was in New Jersey, such as the Newark area. They would phone the city editor or communicate from their two-way radio-equipped company automobile with the picture editor each day, making the calls from New Jersey to the editor's desk in New York City, obtaining their work assignments in this manner. In their cases, the publishers had no separate establishment, office, or physical facilities for them in New Jersey. They would frequent police headquarters in Newark and similar locations whence news stories might emanate. Their news copy and negatives would be delivered to New York by messenger, or by these employees themselves in some special cases. They reported at the newspaper offices in New York City in some instances *157 for special assignments. Their paychecks would be mailed to them in New Jersey from the New York City office of the publisher.
Another group of claimants involved in these appeals solicited classified advertising for their respective newspapers in New Jersey. The classified advertising obtained by these solicitors was transmitted to New York by phone, facsimile, mail, or messenger.
One of these solicitors, Borden, employed by the Herald Tribune as an outside classified advertising salesman for Bergen County, called on prospective advertisers, reported by phone daily to the suburban classified advertising manager at the paper's New York office, performed incidental clerical duties at his New Jersey home, but attended each Friday afternoon at the New York plant, where he prepared his advertising copy for Sunday publication, answered any messages he might have there, conferred with his supervisor, and picked up his paycheck.
Four other classified advertising solicitors solicited such advertising for the Times in New Jersey, working at and out of an office maintained by the Times in Newark. Two of these, O'Hara and Winters, were telephone solicitors working at that office. Two other Times solicitors, Rowlands and Holland, were outside solicitors, working at or out of this office. Rowlands was in charge of the office, supervised the other solicitors, and occasionally attended meetings in New York. The other Times solicitors did not attend at the New York office.
The News also maintained an office in Hackensack, out of which its advertising solicitors worked and which was in charge of its New Jersey manager for advertising. All advertising copy obtained by these solicitors was sent to New York. Paychecks were forwarded from New York to Hackensack by messenger and there distributed. These advertising solicitors for the News are not involved in these appeals. Those who were not members of the Guild reported for work and were *158 assigned to the New York office where they worked throughout the strike.
However, there is an appeal by Angela Basso, who was employed by the News at its Hackensack office as a stenographer. She typed the reports of the solicitors which were sent to the New York office. She also tended the telephone switch-board at the office. Although the Hackensack office of the News remained open during the strike and was manned by its manager and Miss Basso could have reported for work, if she had been willing to work, she interpreted the instructions from the Guild, of which she was a member, as meaning that she should not report for work during the strike. Accordingly, she remained away from the office.
The remaining claimants were employed as circulation "roadmen" and "list clerks." The work of the home delivery roadmen was to promote and expedite the sale and delivery of the New York newspapers in specified areas in New Jersey. Each worked at and out of a local circulation office maintained by the publisher, at which a "list clerk," or circulation clerk-typist, performed all necessary clerical work relating to local circulation, under the supervision of the roadman. The roadmen attended occasional sales meetings in New York. The roadmen reported by phone to the home delivery circulation manager in New York at least once and usually twice or three times daily. The roadmen and clerks are in frequent telephone communication with the New York office to receive and transmit complaints. Reports prepared by the clerks are mailed to New York. These employees were paid by mail.
Some of the roadmen, known as "suburban circulation roadmen," regulate and supervise delivery of the newspaper by independent dealers to newsstands in a given territory in New Jersey. Such a roadman works at the premises in New Jersey of the newsdealer he supervises and in the field. He reports by phone to the circulation manager of his newspaper in New York two or three times daily and on these occasions may receive instructions and suggestions from the manager. Weekly reports are mailed to New York. The suburban circulation *159 roadmen employed by the Herald Tribune attended sales meetings every second Thursday at the New York plant of that newspaper, at which time they picked up their pay-checks. So, too, the circulation roadmen involved in these appeals, employed by the Times and Mirror, also attended occasional sales meetings in New York.
By telephone or by telegram, the Times notified its employees immediately upon the calling of the strike that the Newark office was being closed until the strike was over and, if they wanted to work during the strike, they could report for other work at the plant in New York, which work would be of a temporary nature pending day-to-day developments. Some of the Times employees did report to New York and worked during the entire period of the printers' strike. The Times employees who are claimants on this appeal did not report for such work, in compliance with the Guild's instructions that they should not cross picket lines or accept offers of work from the publishers while the strike was in progress.
The Herald Tribune and Mirror, informed of the printers' strike against the Times and News, as noted above, suspended publication and locked out their employees on December 8, 1962 and during the pendency of the strike. The printers' union immediately established picket lines at the New York plants of these publishers, proclaiming the fact of the lockout. The Guild considered the newspaper employees in New Jersey to have been locked out by this action of the publishers of the Herald Tribune and Mirror. Strike benefits were paid by the Guild out of its funds to all of its members who were off the payroll of the publisher, whether because they voluntarily refused to cross the picket lines in New York or were locked out or for any other reason.

I.
It is clear that the unemployment of claimants was due "to a stoppage of work * * * because of a labor dispute." But claimants maintain that the labor dispute was not "at" the establishment or other premises, "at which" the claimants *160 were employed. Geographically, the physical location of their work area was generally in New Jersey, with periodic or occasional visits in some instances to the New York offices of the newspaper publishers. Claimants also argue that there was no labor dispute to which they were a party; that there were no picket lines in New Jersey where they performed their duties principally or entirely; and that the "establishment" at which they worked was physically separated from the newspaper establishment in New York. On these facts, they contend that they were not disqualified from receiving unemployment benefits under N.J.S.A. 43:21-5(d), supra.
In Ford Motor Co. v. New Jersey Department of Labor and Industry, Division of Employment Security, Board of Review, supra, there was a labor dispute at factories in Michigan, at which Ford manufactured parts for its automobiles. A strike ensued and, in the course of time, Ford's employees at its assembly plants in New Jersey were idled because of the lack of the manufactured parts. The employees in New Jersey were not out on strike, were not members of the Michigan union involved in the labor dispute there, and became unemployed only because there was no work for them here for want of the parts to be assembled. Thus, in the Ford case, although there was a stoppage of work in New Jersey which resulted from a labor dispute in Michigan, our Supreme Court held that the New Jersey employees were not disqualified thereby from receiving unemployment benefits.
Justice Heher summed up the Ford rationale in these words:
"Here, geographical separation and the nature of the function combine to make the New Jersey plants distinct establishments within the intendment of the statutory provision under consideration. Parts are there assembled into automobiles ready for regional market distribution. This localization of the plants is an essential part of Ford's own economy. The plants constitute separate factories or establishments. While integrated with the central plant, there is a physical and functional separation, for this purpose, which gives the local plants the status of a factory or an establishment in the statutory sense." (5 N.J., at p. 505; emphasis added)
*161 To this the court added, at page 505, that the "statutory concept is an employment unit within the State," and that "Physical place is the major element in this definition." (Emphasis added) It concluded that a "work stoppage due alone to economic dependence upon the participants in a labor dispute beyond the factory or establishment at which the claimant is or was last employed does not give rise to the statutory disqualification." Id., at p. 506.
Thus, the word "establishment" in N.J.S.A. 43:21-5(d) does not embrace as a single unit "all plants in a vast enterprise like Ford's merely because of `functional integrality' and `synchronization' with the central plant." 5 N.J., at p. 506. Moreover, the Supreme Court noted in the Ford case: "There was no participation in the strike here by the local unions or the individual claimants, such as constitutes a bar to relief under the statute." Ibid.
In the instant case there was "functional integrality" in the work efforts of these New Jersey claimants and those of their co-workers in New York in the publication and distribution of these New York papers. The daily operations of the employees were so intertwined that one group collaborated with the other in producing the end result. The reporters, photographers, advertising solicitors, distribution supervisors, and their aides were in daily contact with their superiors in New York City, making their reports and receiving instructions in this co-operative day-to-day activity. The New York personnel exercised supervision and control over the employees, whose work area was essentially, although in some instances not entirely, in New Jersey. As noted above, several of the claimants actually attended periodically and when required at meetings in New York City.
Mere functional integrality with an establishment outside the State is not generally sufficient per se to disqualify an employee from receiving unemployment benefits, when there is a stoppage of work because of a labor dispute at one place and the employee works at another place. But it is a factor to be considered with all the other facts and circumstances *162 of the case. Nor does mere geographical or physical separation per se obviate the disqualification provision from coming into play. Thus, if the printers were on strike in building A of their employer and that strike caused a stoppage of work for other employees of the same employer, whose seat of operation was a nearby building B, the physical separation of the two buildings would not make the employees in building B any the less part of the same business establishment as that of the workers in building A. We pointed out in Ford Motor Co. v. N.J. Dept. of Labor & Industry, 7 N.J. Super. 30, 40 (App. Div. 1950), affirmed 5 N.J. 494 (1950), that "if two or more places of business of an employer are ever to be considered one `establishment', an essential factor must be physical proximity." We there found that the distance between Ford's Michigan plants and its New Jersey plants "is so great as to make it impossible to find physical proximity without destroying physical proximity entirely as a test." Ibid.
The Newark and Hackensack offices, at which some of the claimants herein worked, are separated from the New York City main offices by the Hudson River, boundary between the two states, and a distance of ten miles more or less. Thus, there is obviously much more physical proximity in this case than in the Ford case, although there is less proximity than that of nearby buildings assumed in our illustration above. In General Motors Corp. v. Mulquin, 134 Conn. 118, 55 A.2d 732 (Sup. Ct. Err. 1947), in interpreting the significance of the expression "or other premises," as used in the statute making an employee ineligible for unemployment benefits when his unemployment is due to the existence of a labor dispute at the factory, establishment or "other premises at which he is or has been employed," the court held that the test is whether the separated buildings "are so operated as to constitute a single unit." 55 A.2d, at p. 738. It found that geographical separation is important but is by no means controlling. In Mulquin, the two plants were in Connecticut: one at Bristol and the other, about 18 miles away, at Meriden. *163 The Meriden employees were declared ineligible for unemployment benefits, as coming within the meaning of "other premises" of the employer, although the work stoppage was initially due to a strike at the Bristol plant. Both plants were deemed to be one under the statute. Their physical separation by 18 miles was held not to be controlling.
In Adamski v. State Bureau of Unemployment Comp., 108 Ohio App. 198, 161 N.E.2d 907 (Ct. App. 1959), the court held that where an employer manufactured spark plugs, which were assembled at its main plant located in Ohio, using ceramic insulators made at its Michigan plant 50 or 60 miles distant and transported daily by truck to the Ohio plant, and the Michigan plant was under control of the employer's Ohio offices, and a labor dispute occurred at the Michigan plant, and the employer was forced to lay off employees at the Ohio plant because ceramic insulators were not received from the Michigan plant, employees laid off at the Ohio plant were not entitled to unemployment benefits because of a labor dispute at the "establishment" where they were employed, within the meaning of the statutory provision relating to a labor dispute "at the factory, establishment, or other premises" at which they were employed. The tests of functional integrality and physical proximity were held to be satisfied and, as to the circumstance of a state line separating the two locations, the court said:
"It is difficult to see how such conclusion would be different if the one plant of the company was located just over the state line of Ohio and in an adjoining state. The fact still remains that the employee lost his employment by reason of a labor dispute in the establishment of the employer. * * * The statute does not exempt the employer because a part of his business establishment lies over the state line."
In McGee v. Timken Roller Bearing Co., 161 N.E.2d 905 (Ohio Ct. App. 1956), a geographical difference of 90 miles was deemed to be of "no consequence" under the facts and the court found plants constituted an integrated establishment, though physically separated by that distance. In Spielmann *164 v. Industrial Commission, 236 Wis. 240, 295 N.W. 1 (Sup. Ct. 1940), the rule of interpretation of "establishment" was expressed as embracing "physical proximity, functional integrality and general unity." In Spielmann the two plants in Wisconsin were separated by a distance of 40 miles. In Chrysler Corporation v. Smith, 297 Mich. 438, 298 N.W. 87, 135 A.L.R. 900 (Sup. Ct. 1941), nine plants of the Chrysler Corporation located in Michigan, all within 11 miles of the main plant, were held to constitute a single establishment, under the meaning of "establishment" used in the statute. The test set forth in the Spielmann case was applied, namely, "the physical proximity, functional integrality and general unity" of the plants. A company's statewide system was held to constitute a "single establishment" in Mountain States Tel. & Tel. Co. v. Sakrison, 71 Ariz. 219, 225 P.2d 707 (Sup. Ct. 1950). These cases illustrate that mere physical separation of an employer's places of operation does not per se make separate establishments out of a unified business operation.
We conclude that, under the facts herein, the auxiliary offices in Newark and Hackensack, in reasonably close proximity to the main offices in New York City, functionally integrated in work operations to produce the end result, viz., publication and distribution of these daily newspapers, subject to supervision and control from New York City, constituted part of the unitary establishments of the publishers at which the claimants were employed when there was a work stoppage due to a labor dispute at the establishment or other premises of the employer.
A fortiori, those claimants, such as news reporters, photographers, advertising solicitors, roadmen, and distribution supervisors, who operated out in the field, taking their daily orders from the city editor or other supervisors located in New York City and reporting directly thereto by telephone, messenger or personally, attending meetings and conferences at the main office in New York City as part of their work duties, all members of the New York chapter of the *165 American Newspaper Guild and subject to its directives, paid by checks mailed from the New York office, are, in effect, employed at the newspaper establishments in New York City, albeit performance of their duties required in large measure their personal presence in certain areas of New Jersey.
N.J.S.A. 43:21-5(d) exempts from disqualification an employee, if it is shown that:
"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *."
Claimants contend that they come within that exemption because they did not participate in the labor dispute or help to finance it and they were not directly interested in it, their Guild having settled its own separate earlier labor dispute by negotiating contracts acceptable to its members.
The record clearly indicates that the Guild, of which claimants were members, did actively participate in the labor dispute directly involving the printers' union and its members. The Guild expressly instructed all of its members, including those in New Jersey as well as those in New York, not to cross picket lines set up by the printers in New York City and, if the publishers invited key employees to report for work, "It is expected that no Guild member accept such an offer while their fellow employees are out." (Emphasis added) In pursuance of that directive, Guild members refused to cross the picket lines or accept employment at the New York offices. The craft unions and Guild presented a united front against the equally united Publishers' Association, so that from each side of the controversy the policy was "All for one and one for all." A Labor Unity Committee was formed to support the position of the striking printers and *166 the locked out employees of the publishers. The Guild's executive vice-president represented it on that committee. This Unity Committee held its meetings in a hotel room only two doors away from that in which negotiations were conducted between the representatives of the craft unions and the Publishers' Association. Proposals for settlement of the labor dispute were passed upon by the Labor Unity Committee before final acceptance.
The Guild itself became directly involved in the labor dispute when one of the terms of settlement was an insistence that there should be a common expiration date for all union contracts. Thereupon, the Guild contracts, previously settled, were extended until March 31, 1965 to coincide with the terms of the new contracts with the printers' and other craft unions. That the Guild regarded itself as interested in the labor dispute may be further gleaned from the fact that the Guild advised its members, "Those Guild members who suffer pay losses will be eligible for Guild strike benefits." The Guild had made it known to the publishers prior to the printers walking off the job on December 8, 1962 that they regarded the demands of the printers' union as just, that they should be met and, if the printers went on strike, then the Guild would pledge the strikers all-out support. The Guild lived up to its promise. It participated in the craft union's labor dispute almost as though it were its own.
Acquiescence by claimants, as voluntary members of the New York Chapter of the American Newspaper Guild, in the conduct of the officers of the Guild and the participation of their fellow members in refusing to cross the picket lines, as well as their own obedience to the directive of the Guild officers to its members, constituted a sufficient participation in the labor dispute as to bring them outside the exemption from disqualification provided in N.J.S.A. 43:21-5 (d) (1), (2). See Prentice v. Unemployment Compensation Board of Review, 161 Pa. Super. 630, 56 A.2d 295 (Super. Ct. 1948). A union member, by voluntarily joining a union and agreeing to adhere to its principles and to obey the orders *167 of its officials, becomes bound by the authority delegated by him to the union officials to act in his behalf. In the absence of dissent on their part or noncompliance with the directive of their chosen officials, claimants may not escape the consequences of the conduct of the officers of the Guild and their fellow members in aiding and abetting the printers' strike. It is now established by law in this State that a voluntary refusal to cross a picket line constitutes a contributing participation in the labor dispute. Soricelli v. Board of Review, 46 N.J. Super. 299, 309 (App. Div. 1957); Marczi v. Board of Review, 63 N.J. Super. 75, 78, 81 (App. Div. 1960). A member of a union is directly interested and involved in a labor dispute conducted by his union in his behalf. Wasyluk v. Mack Manufacturing Corp., 4 N.J. Super. 559 (App. Div. 1949); Gerber v. Board of Review, 36 N.J. Super. 322, 331 (App. Div. 1955), affirmed 20 N.J. 561 (1956).
A. Borchman Sons v. Carpenter, 166 Neb. 322, 89 N.W.2d 123 (Sup. Ct. 1958), is a case somewhat analogous to that before us. There a number of general contractors in the Omaha area had formed an association for the purpose of representing all of its members in matters of common interest. The association acted as bargaining representative for all its members in labor contract matters. All of the unions in the same area were members of a building trades council, which was composed of delegates of the various unions connected with the building trades, and this "council of unions" had been formed to aid each other in labor disputes and to support actions taken by any of the unions. Each side counted on its combined strength to enforce economic sanctions against the other. In that case one of the unions went out on strike and the other trade unions in the council supported the efforts of the striking union. It was held that the members of the remaining unions in the council, who were put out of work as a result, were directly interested in the outcome of the strike and, therefore, were participants in the labor dispute and disqualified from receiving benefits. The *168 Nebraska court ruled that it was of no consequence that the claimants were not members of the union conducting the strike or that they may not have been in sympathy with its purposes. These facts are analogous to the facts in the instant case and the rationale therein seems equally applicable here. We would conclude that under the facts and circumstances herein, the claimants, as members of the New York chapter of the Guild, in view of their acquiescence and lack of dissent from the conduct of their officers and associate members, were participating in and directly interested in the labor dispute which caused the stoppage of work.

III.
The Times notified its employees that the Newark office would be closed until the strike was over and, if they wanted to work during the strike they could report for other work on a temporary day-to-day basis at the Times plant on 43rd Street, New York City, commencing with December 10, 1962. Although some Times employees, other than claimants, employed by the Times did report and did work during the entire period of the strike, claimants Rowlands, Holland, O'Hara and Winters did not report for such work, although work was available at the Times plant in New York City. So, too, claimants Duffy and Feldman, roadmen employed by the Times, were told that work other than their usual work as roadmen was available to them at the New York plant and that they could report commencing December 10, 1962. They, too, did not report for work. The refusal of these Times workers to report was evidently in compliance with the Guild's instructions to its members, as noted above, not to cross the picket lines which had been set up in New York and not to accept offers of other employment from their employers. This voluntary conduct on their part is a further reason for not recognizing their claim to exemption from disqualification from receiving unemployment benefits.

*169 IV.
A still further reason for disqualifying the claimants who performed services in New Jersey as employees of the Herald Tribune and Mirror is the fact that when the strike commenced these New York City publishers, as members of the publishers' association, became locked in a power struggle between them and the council of craft unions and Guild arrayed on the opposite side. The Herald Tribune and Mirror suspended publication, along with the others, under a mutual assistance pact and invoked, as a retaliatory maneuver in this labor dispute, a lockout of their employees. "The term `lockout' as used in the field of labor law comprehends a voluntary and unlawful cessation or break in the term of employment by the employer." Bogue Elec. Co. v. Board of Review, 21 N.J. 431, 437 (1956). It is now well established law in the State that lockouts as well as strikes are two of the forms by which a "labor dispute" may be manifested and that, in either event, the State occupies a completely neutral position without regard to the rightness or reasonableness of the position or demands of the employer or the employees. If the labor dispute is manifested by a strike or lockout the statutory disqualification applies. Sweeney v. Board of Review, 43 N.J. 535 (1965); Mortensen v. Board of Review, 21 N.J. 242, 246 (1956); Schoenwiesner v. Board of Review, Division of Employment Security, 44 N.J. Super. 377 (App. Div. 1957). As this court stated in Schoenwiesner,
"* * * it has been authoritatively stated in our cases that a labor dispute includes a lockout within the intendment of the statutory clause." (at p. 378)
The statutory clause is, of course, the disqualification provision under N.J.S.A. 43:21-5(d).
For the foregoing reasons, we conclude that the judgment of the Board of Review should be affirmed.